FILED
United States Court of Appeals
Tenth Circuit

September 18, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

PENNIE L. KEYES-ZACHARY,

       Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, Commissioner
of Social Security Administration,

       Defendant-Appellee.

No. 11-5152

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 4:10-CV-00529-TLW)**

---

Submitted on the briefs:[*]

Timothy M. White and Richmond J. Brownson, Tulsa, Oklahoma, for
Plaintiff-Appellant.

Thomas Scott Woodward, United States Attorney, Cathryn McClanahan, Assistant
United States Attorney, Michael McGaughran, Regional Chief Counsel, Region VI,
Virginia Watson Keyes, Special Assistant United States Attorney, Office of General
Counsel, Region VI, Social Security Administration, Dallas, Texas, for
Defendant-Appellee.

---

      After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument.

Before **HARTZ**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Pennie L. Keyes-Zachary appeals from an order of the district court affirming the Commissioner's decision denying her applications for Social Security disability and Supplemental Security Income benefits. Ms. Keyes-Zachary's protected filing date was June 7, 2004. She alleges disability based on, among other things, neck, back, shoulder, elbow, wrist, hand, and knee problems, accompanied by pain; hearing loss; urinary frequency; anger-management problems; depression; and anxiety.

This case has a rather lengthy procedural history. After the agency denied her 2004 applications initially and on reconsideration, Ms. Keyes-Zachary received her first hearing before an administrative law judge (ALJ) on July 18, 2006. She testified at the hearing to her medical condition and limitations. The ALJ upheld the denial of her application for benefits. The Appeals Council denied her request for review of the ALJ's decision, and she then appealed to the district court. The district court remanded the case to the ALJ for further consideration.

On September 22, 2009, the ALJ held a second hearing, at which Ms. Keyes-Zachary again testified. In his decision following this hearing, the ALJ determined that she retained the residual functional capacity (RFC) to perform light work, defined in 20 C.F.R. § § 404.1567(b) and 416.967(b), with certain restrictions. He elaborated:

[T]he claimant is able to lift and/or carry 20 pounds, stand and/or walk 6 hours in an 8 hour workday at 30 minute intervals, sit 6 hours in an 8 hour workday at 2 hour intervals, and she is limited in her ability to climb and squat. The claimant is able to occasionally bend, stoop, crouch, crawl, operate foot controls, push and/or pull with her right upper extremity, reach overhead with her right upper extremity, and twist/nod her head. The claimant is slightly limited in her ability to finger, feel and grip with her right upper extremity and she should avoid fine vision, low noise, dust, fumes and gases, rough uneven surfaces, unprotected heights, fast and dangerous machinery, and heat/wet environments and she requires easy accessibility to rest rooms. Additionally, the claimant is able to perform simple, repetitive and routine tasks and is slightly limited in reference to contact with the general public, co-workers and supervisors.

Aplt. App., Vol. 3 at 469.

The ALJ found that Ms. Keyes-Zachary could not return to her past relevant work as a cook's helper, stuffer, sewer, inspector, and retail cashier/stocker, but that considering her age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that she could perform, such as arcade attendant, bench assembler, order clerk, or clerical mailer. Applying the Medical-Vocational Guidelines, 20 C.F.R. pt. 404, Subpt. P, App. 2, rule 202.18 as a framework, the ALJ concluded that Ms. Keyes-Zachary was not disabled within the meaning of the Social Security Act. The Appeals Council declined jurisdiction, making the ALJ's decision the Commissioner's final decision.

We review the Commissioner's decision to determine whether the ALJ's "factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010). "Substantial evidence is such relevant evidence as a reasonable

- 3 -

mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).

On appeal Ms. Keyes-Zachary raises two issues. She first argues that the ALJ "failed to properly consider, evaluate and discuss the medical source evidence." Aplt. Br. at 16. Second, she contends that the ALJ "failed to perform a proper credibility determination." *Id.* at 21. She also presents a number of subissues and arguments, many of them poorly developed. We will consider and discuss only those of her contentions that have been adequately briefed for our review. *See Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004) ("The scope of our review . . . is limited to the issues the claimant . . . adequately presents on appeal." (internal quotation marks omitted)).

## I. ALJ's evaluation of medical-source evidence

### A. ALJ's weighing of medical opinions

We begin with Ms. Keyes-Zachary's argument about the medical-source evidence. The centerpiece of this argument is her contention that the ALJ failed to weigh the medical opinions in the file.

It is the ALJ's duty to give consideration to all the medical opinions in the record. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). He must also discuss the weight he assigns to such opinions. *See id.* §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii) ("[T]he administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program

- 4 -

physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.").

Ms. Keyes-Zachary cites five opinions that allegedly were not weighed: three consulting-examiner reports; a comprehensive mental-health assessment from a mental-health provider; and a mental-status form from a treating physician. But with two minor exceptions, which we will discuss, she does not identify any inconsistencies either among these medical opinions or between the opinions and the ALJ's RFC. *See Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004) ("When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened.").

### 1. Dr. Gordon's consultative examination report

The first opinion that Ms. Keyes-Zachary complains was not properly weighed is a psychological evaluation prepared by a consulting psychologist, Dr. Minor W. Gordon, Ph.D. Dr. Gordon concluded that she suffered from dysthymic disorder, mild to moderate; learning disabilities; and mild impairment at Axis IV. He gave her a GAF (Global Assessment of Functioning) score of 65.[1] The ALJ discussed Dr.

---

[1]     The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":

(continued)

- 91-100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
- 81-90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
- 71-80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
- 61-70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
- 51-60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
- 41-50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
- 31-40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
- 21-30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
- 11-20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."
- 1-10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
- 0: "Inadequate information."

(continued)

Gordon's report at some length but never explicitly stated whether he found it persuasive or what weight he assigned to it.

This alleged error in the ALJ's decision did not, however, prejudice Ms. Keyes-Zachary, because giving greater weight to Dr. Gordon's opinion would not have helped her. Dr. Gordon accompanied his report with a mental-medical-source statement opining that she had "no limitation" or "no significant limitation" in *every* category relevant to work function. The ALJ noted this lack of limitations in Dr. Gordon's opinion and developed a mental RFC consistent with Dr. Gordon's findings in some areas but more favorable to Ms. Keyes-Zachary than Dr. Gordon's findings in other areas.[2] *Cf. Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (approving harmless-error analysis when "based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable

*Id.* at 34 (emphasis omitted).

[2]     Ms. Keyes-Zachary's reply brief argues that in his mental-medical-source statement Dr. Gordon actually found her less mentally restricted in the areas of activities of daily living, social functioning, and concentration, persistence and pace than the ALJ did in his decision. She complains that the Commissioner has "failed to explain this inconsistency." Reply Br. at 7. Ms. Keyes-Zachary does not say how it could possibly benefit her to have the ALJ explain his failure to adopt the more unfavorable portions of Dr. Gordon's opinion or how his failure to provide such an explanation is even error. *See Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) ("[W]e are aware of no controlling authority holding that the full adverse force of a medical opinion cannot be moderated favorably [toward the claimant] unless the ALJ provides an explanation for extending the claimant such a benefit.").

administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.").

## 2. Dr. Reddy's consultative-examination report

Ms. Keyes-Zachary also mentions a physical-consultative-examination report prepared by Dr. Sri K. Reddy. The report itself expresses few conclusions about her physical capacities, but Dr. Reddy's accompanying physical-medical-source statement opined that Ms. Keyes-Zachary could sit, stand, or walk for eight hours at a time and for eight hours in an eight-hour workday and otherwise found only modest limitations. The ALJ discussed this record but did not expressly weigh it. His RFC, however, is generally consistent with Dr. Reddy's findings. There is no reason to believe that a further analysis or weighing of this opinion could advance Ms. Keyes-Zachary's claim of disability. The alleged error is harmless.

## 3. Therapist Blasdel's mental-health assessment

Next is a mental-health assessment performed by therapist Bob Blasdel. Mr. Blasdel is neither a physician nor a psychologist; his credentials are stated as "MS, LADC, LMFT." *Id.* at 823. The ALJ did discuss his report in two paragraphs, but did not provide any analysis from which it can be determined what weight he gave to it.

Although Mr. Blasdel is not an "acceptable medical source" such as a medical doctor or a licensed psychologist, *see* 20 C.F.R. § 404.1513(a), the ALJ was still required to explain the amount of weight he gave to the opinions he expressed:

> [T]he adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006).

Most of Mr. Blasdel's report is a narrative summary of statements by Ms. Keyes-Zachary. These portions of the report do not express any *opinions* concerning her "symptoms, diagnosis and prognosis, what [she] can still do despite the impairment(s), [or her] physical and mental restrictions." *Id.* at *5. The ALJ was not required to assign a weight to Mr. Blasdel's narrative of statements relayed to him by Ms. Keyes-Zachary.

There are, however, a few statements scattered throughout the report that might be considered "opinions" in the broad sense described by SSR 06-03p. Mr. Blasdel noted, for example, that Ms. Keyes-Zachary's "intellectual level is estimated to be within the borderline average range" and that her "cognitive abilities are essentially intact." Aplt. App., Vol. 5 at 818. He stated that her "clinical presentation includes moderately severe depression with an element of increased anxiety" and he estimated her readiness for change as "fair." *Id.* He opined that "it is very much possible that she has some learning/processing deficits," *id.* at 822, and noted "[p]otential negative factors" that might affect her therapy including "a multitude of psychiatric issues" and "very poor coping skills," *id.* at 823. He also made some passing common-sense observations, noting that Ms. Keyes-Zachary's

- 9 -

"aggressive behavior could be considered quite risky," *id.* at 819, and that "[s]he could probably benefit from additional positive social interaction," *id.* at 821. None of these observations, however, offers an assessment of the effect of Ms. Keyes-Zachary's mental limitations on her ability to work. The file includes much more directly relevant evidence on these issues from acceptable medical sources. The ALJ's failure to assign a specific weight to Mr. Blasdel's observations therefore did not represent harmful error.

Of more concern was Mr. Blasdel's assignment to Ms. Keyes-Zachary of a current GAF score of 46, and a highest GAF score in the previous year of 50. The vocational expert (VE) testified that scores in this range would eliminate all jobs because a person with these GAF scores cannot maintain a job. This low GAF score is inconsistent with other GAF evidence in the record, and the ALJ did not explain how he weighed the conflicting GAF evidence. But this lack of comparative analysis and weighing does not require reversal.

In the case of a nonacceptable medical source like Mr. Blasdel, the ALJ's decision is sufficient if it permits us to "follow the adjudicator's reasoning." SSR 06-03p, 2006 WL 2329939, at *6. Particularly given the VE's testimony on the GAF-score issue, it is obvious that the ALJ gave little or no weight to Mr. Blasdel's GAF opinion. Simply put, had he assigned great weight to the low GAF score, he would not have developed the mental RFC for Ms. Keyes-Zachary that he did.

We further note that Ms. Keyes-Zachary fails to show that the ALJ erred by rejecting or assigning only modest weight to Mr. Blasdel's low GAF score in light of the other GAF evidence in the record. Dr. Gordon's report, assigning Ms. Keyes-Zachary a GAF score of 65, was prepared by an "acceptable medical source" and hence qualified as a medical opinion, while the GAF score of 45, assessed by a counselor, was not. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a). This alone justifies reliance on Dr. Gordon's higher GAF score. *See* SSR 06–03p, 2006 WL 2329939, at *5 ("The fact that a medical opinion is from an acceptable medical source is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an acceptable medical source because . . . acceptable medical sources are the most qualified health care professionals." (internal quotation marks omitted)). In sum, we discern no harmful error here.

### 4. Dr. Crall's disability examination

Stephanie C. Crall, Ph.D., conducted a disability examination of Ms. Keyes-Zachary on December 19, 2008. The ALJ mentioned her evaluation, noting that Dr. Crall had found Ms. Keyes-Zachary to be suffering from "major depressive disorder, moderate, chronic and anxiety disorder." *Id.*, Vol. 3 at 474. He did not state what weight he assigned to the opinion.

Dr. Crall's most specific opinion concerning Ms. Keyes-Zachary's mental RFC was as follows:

In the opinion of this evaluator, her ability to engage in work-related mental activities, such as sustaining attention, understanding, and remembering and to persist at such activities was likely adequate for simple and some complex tasks. Functional limitations appeared more likely due to physical rather than mental impairments.

*Id.*, Vol. 5 at 838. These specific limitations that Dr. Crall assigned to Ms. Keyes-Zachary were not inconsistent with the limitations the ALJ placed in her RFC. *See id.*, Vol. 3 at 469 (limiting Ms. Keyes-Zachary to "simple, repetitive and routine tasks" and slightly limiting her "contact with the general public, co-workers and supervisors"). Any error in failing to specify the weight given to the opinion was harmless.

### 5. The Mental-Status Form

Finally, Ms. Keyes-Zachary points to a mental-status form completed on March 30, 2009, diagnosing her with major depression (recurrent moderately) and generalized anxiety. It is unclear who completed this one-page form, which is signed only with a sideways "*S*." Ms. Keyes-Zachary asserts without discussion that it was prepared by an unspecified treating physician. Although the person who completed the form attributed a number of mental limitations to Ms. Keyes-Zachary, the only specific work-related limitation is not inconsistent with the ALJ's RFC. The form states that she can "remember, comprehend and carry out (simple) (complex) instructions on an independent basis." Aplt. App., Vol. 5 at 908. We discern no harmful error in the ALJ's failure to specify the weight he accorded to this opinion.

- 12 -

## B. ALJ's alleged failure to consider medical evidence

The ALJ found that Ms. Keyes-Zachary's medical evidence contained "few objective findings that would substantiate the level of pain that she alleges," and that the record also failed "to demonstrate the presence of any pathological clinical signs, significant medical findings, or any neurological abnormalities that would establish the existence of a pattern of pain of such severity as to prevent her from engaging in any work on a sustained basis." *Id.*, Vol. 3 at 474. Ms. Keyes-Zachary contends that in reaching these conclusions, the ALJ mischaracterized or inadequately considered certain medical evidence.[3]

The regulations require the ALJ to "consider all evidence in [the] case record when [he] make[s] a determination or decision whether [claimant is] disabled." 20 C.F.R. § 404.1520(a)(3). He may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004).

Ms. Keyes-Zachary notes that Dr. Gary R. Lee, a physical consultative examiner ("CE") who saw her in November 2004, determined that she had "decreased, painful ROM [range of motion] with tenderness of the spine." Although Dr. Lee did make such findings, this decreased or painful range of motion was

---

[3]     Because of the heading under which this argument appears in Ms. Keyes-Zachary's brief, we view the argument as an assertion that the ALJ's findings concerning the state of the medical record are unsupported by substantial evidence, rather than as part of a more general attack on his conclusions concerning Ms. Keyes-Zachary's credibility, which are the subject of her second issue, discussed *infra*.

consistent with the ALJ's conclusion that she is able to do a limited range of light work. Dr. Lee noted that she could extend her back 20° out of an expected 25 and could flex it 70° out of an expected 90; that she could laterally flex her back 20° on both left and right out of an expected 25; that she could extend her neck by 30° out of an expected 60, and flex her neck by 40° out of an expected 50; and that she had a right extension value for her elbow of negative 5°, while the expected value was 0. Otherwise, all his ROM findings were normal.

Ms. Keyes-Zachary next cites examination results from Dr. Sri K. Reddy, the CE who examined her in September 2006. These results do not support her attack on the ALJ's findings. Dr. Reddy found that she had "functional" ROM in various joints, but also noted that she had tenderness in the spine and knees and some reduced sensation in her feet. *Id.* She appears to believe that these exam results support her argument about significantly limiting pain. (We note that Ms. Keyes-Zachary simultaneously attacks Dr. Reddy for failing to measure and report ROMs specifically and instead simply concluding that they were "functional"; she does not, however, cite any authority requiring a consultative examiner to report specific ROM values.) But despite his findings concerning tenderness and reduced sensation, Dr. Reddy opined that Ms. Keyes-Zachary could sit, stand, and walk for up to eight hours at a time in an eight-hour day, and could frequently lift up to 25 pounds and frequently carry 20 pounds.

- 14 -

Neither Dr. Lee's nor Dr. Reddy's examination undermines the ALJ's

conclusions concerning the severity of Ms. Keyes-Zachary's physical impairments.

To the extent that she raises additional issues involving the ALJ's evaluation of the

medical evidence, her arguments lack merit or are insufficiently developed for our

review. In sum, we reject Ms. Keyes-Zachary's contention that the ALJ's opinion

does not adequately evaluate and discuss the medical-source evidence. Where, as

here, we can follow the adjudicator's reasoning in conducting our review, and can

determine that correct legal standards have been applied, merely technical omissions

in the ALJ's reasoning do not dictate reversal. In conducting our review, we should,

indeed must, exercise common sense. The more comprehensive the ALJ's

explanation, the easier our task; but we cannot insist on technical perfection.

## II. The ALJ's credibility determination

A disability claimant's complaints of disabling pain are evaluated using the

three-step analysis set out in *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987). Under

*Luna* an ALJ faced with a claim of disabling pain is required to consider and

determine (1) whether the claimant established a pain-producing impairment by

objective medical evidence; (2) if so, whether the impairment is reasonably expected

to produce some pain of the sort alleged (what we term a "loose nexus"); and (3) if

so, whether, considering all the evidence, both objective and subjective, the

claimant's pain was in fact disabling. *Id.* at 163-64.

- 15 -

Evidence the ALJ should consider includes such items as "a claimant's persistent attempts to find relief for h[er] pain and h[er] willingness to try any treatment prescribed, regular use of crutches or a cane, regular contact with a doctor, and the possibility that psychological disorders combine with physical problems" and "the claimant's daily activities, and the dosage, effectiveness, and side effects of medication." *Id.* at 165-66. But so long as the ALJ "sets forth the specific evidence he relies on in evaluating the claimant's credibility," he need not make a "formalistic factor-by-factor recitation of the evidence." *See Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). Again, common sense, not technical perfection, is our guide.

### A. ALJ's application of *Luna* factors

Ms. Keyes-Zachary complains that the ALJ failed to discuss and apply properly the *Luna* factors for assessing credibility in evaluating her complaints of pain and other symptoms. The record shows, however, that the ALJ did assess a number of the *Luna* factors, tying them to evidence in the record, contrary to Ms. Keyes-Zachary's contention that he failed to do so.

The ALJ properly noted these facts: (1) Ms. Keyes-Zachary had undergone no surgery for her shoulder problems and none had been recommended for her; (2) she had also undergone no surgery for her neck or back problems; (3) she could sometimes rid herself of her headaches with aspirin alone; (4) in 2005 she had described her back pain as only "four" on a one-to-ten scale; (5) one of her treating physicians limited her use of the pain-killer Lortab because he did not want her to use

- 16 -

it routinely; and (6) another treating physician gave her Lortab on a one-time-only

basis.

The only *Luna* factor that Ms. Keyes-Zachary specifically identifies as not

being discussed by the ALJ is her activities of daily living (ADLs). In his decision

the ALJ discussed these activities as follows:

> With respect to activities of daily living, the claimant testified her bed
> "is the couch," which she stated she "stays on all day." The claimant
> stated her mother helps her with laundry, stating she puts them [sic] in,
> then her mother puts them [sic] in the dryer and then she sits on the
> couch and folds them [sic]. The claimant further testified she grocery
> shops, watches television, visits her father, and attends funerals at
> church.

*Id.* at 470.

The ALJ made several observations concerning the credibility of this

testimony. First, he noted that "[t]he claimant has restricted her daily activities, but

the restrictions appear to be self-imposed." *Id.* at 475. Next, he stated that "the

alleged effect of the claimant's symptoms on [her] activities of daily living and basic

task performance is not consistent with the total medical and non-medical evidence in

the file." *Id.* at 475-76. And he concluded:

> [T]he claimant described daily activities that are fairly limited, however,
> two factors weigh against considering these allegations to be strong
> evidence in favor of finding the claimant disabled. First, allegedly
> limited daily activities cannot be objectively verified with any
> reasonable degree of certainty. Secondly, even if the claimant's daily
> activities are truly as limited as alleged, it is difficult to attribute that
> degree of limitation to the claimant's medical condition, as opposed to
> other reasons, in view of the relatively weak medical evidence and other
> factors discussed in this decision. Overall, the claimant's reported

limited daily activities are considered to be outweighed by the other factors discussed in this decision.

*Id.* at 476.

Thus, the ALJ did properly evaluate Ms. Keyes-Zachary's activities of daily living, and at least generally tied his conclusions to the evidence. The only one of the above ALJ findings to which Ms. Keyes-Zachary specifically objects is his statement that her limited ADLs "cannot be objectively verified with any reasonable degree of certainty." *Id.* Citing an unpublished case, *Swanson v. Barnhart*, 190 F. App'x 655, 657 (10th Cir. 2006), she contends that it is error for the ALJ to require objective confirmation of ADLs "as a standard of proof." Aplt. Br. at 22.

But there is subsequent Tenth Circuit *published* authority concerning this issue that is unfavorable to her position. In *Wall v. Astrue*, 561 F.3d 1048 (10th Cir. 2009), this court considered identical language used by an ALJ to discount the claimant's credibility and concluded:

> [T]he ALJ's statement that Claimant's daily limitations could not be "objectively verified with any reasonable degree of certainty" did not state a standard by which the ALJ made his adverse determination of Claimant's credibility. Rather, the ALJ's statement was merely a common sense observation that the ALJ would not treat Claimant's testimony as "strong evidence" of her disability due to his prior determination that Claimant's testimony was not "fully credible."

*Id.* at 1070 (citations omitted).

The same can be said here. The ALJ merely considered the lack of objective verification as a *factor* in assessing the value of Ms. Keyes-Zachary's hearing

- 18 -

testimony concerning her limited daily activities.  Reversal on this issue is inappropriate.

### B. Failure to seek treatment

In assessing Ms. Keyes-Zachary's pain complaint, the ALJ said that she received no medical treatment between September 28, 2005, and April 27, 2006. Medical records submitted with her prior appeal to the Appeals Council, however, show that she was treated by Dr. Sharon Little on November 9, 2005, at which time Dr. Little prescribed medications and ordered an x-ray of her left knee.  She also had blood work done at a tribal clinic in December 2005.  It appears that these records were available to the ALJ, because they were submitted to the Appeals Council on April 12, 2007, and the ALJ did not hold a hearing or reach his decision until 2009.

The ALJ's ignoring the tribal blood work was not reversible error, because the treatment did not relate to her complaint of disabling pain, which is the issue here. As for the visit with Dr. Little, however, although it primarily involved a sinus complaint, Ms. Keyes-Zachary also mentioned her left knee pain and back pain during the appointment.  To treat these conditions, Dr. Little refilled her prescription of Lortab and ordered an x-ray of her left knee.  *Id.* at 325.  Nevertheless, the ALJ's error concerning this visit did not harm Ms. Keyes-Zachary.  The ALJ's decision discussed generally Ms. Keyes-Zachary's use of Lortab, which her physicians did not approve for long-term use.  The left knee x-ray Dr. Little ordered during the November 2005 visit turned out to be negative "except for a questionable

suprapatellar joint effusion." Aplt. App., Vol. 2 at 270. The ALJ discussed this x-ray record, noting its generally negative findings, but incorrectly stating that the x-ray dated from November of 2006 rather than November 2005. Thus, it appears that the ALJ's error was in chronology, not the substance of the visit. In our view, the error in stating that Ms. Keyes-Zachary failed to pursue medical treatment between September 2005 and April 2006 could not have had a substantial effect on the ALJ's assessment of the credibility of her complaint of disabling pain.

Ms. Keyes-Zachary also complains that the ALJ wrongfully noted her failure to undergo surgery as a factor in discounting her credibility. She argues that "[s]urgery is not required for an individual to be credible." Aplt. Br. at 25. She cites an unpublished case, *Cook v. Apfel*, No. 99-6000, 1999 WL 626166, at *4 (10th Cir. Aug. 18, 1999), in which the claimant had failed to have surgery to remove her leaking breast implants. In that case, however, the claimant's doctors had recommended such surgery, and there was evidence that the claimant could not afford the surgery.

Here, by contrast, the ALJ noted that "when questioned, [Ms. Keyes-Zachary] admitted she underwent no surgery and stated 'none *has been recommended* on the shoulder.'" Aplt. App., Vol. 3 at 470 (emphasis added). He also noted that she had not undergone any surgery on her neck or back. The lack of surgery appears to have been used to discount the severity of the impairments, which is a legitimate consideration for the ALJ's analysis. Accordingly, the argument lacks merit.

- 20 -

## C.  ALJ's discussion of credible and incredible testimony

Ms. Keyes-Zachary complains that the ALJ did not adequately analyze or discuss her hearing testimony.  In particular, although he found her testimony credible only to the extent that she could perform a narrowed range of light work, he allegedly failed to explain which portions of the testimony he believed and which portions he found not credible.  *See Hayden v. Barnhart*, 374 F.3d 986, 992 (10th Cir. 2004) (noting ALJ's failure to "specify what testimony he found not to be credible").  In a related claim of error, she complains that the ALJ "stated that he did not discount all of her complaints, but failed to explain which complaints he did not discount." Aplt. Br. at 23.

These arguments fail to demonstrate reversible error.  True, the ALJ did not explicitly state "I find this statement credible" or "I find this statement not credible" for each factual assertion made by Ms. Keyes-Zachary.  Instead, he listed many of her specific factual assertions, often following them by a qualifying statement to indicate where he believed her testimony was contradicted or limited by other evidence in the record.  A few of these instances will suffice to illustrate the ALJ's approach:

> At the time of the hearing, the claimant testified she last worked in December 2001 at American Fiber.  *However*, the claimant then testified she worked from January 2002 through March 2002, as a stocker at a liquor store.
>
> [T]he claimant stated when injured, she "hit the cement floor with her shoulder," which then jammed "everything up."  *However*, when

questioned further, the claimant admitted she underwent no surgery and stated "none has been recommended on the shoulder."

The claimant . . . stated she suffers from cardiovascular pulmonary spasms. *However*, the claimant admitted she has no physical restrictions as related to her heart, stating she "mainly just watches the medications."

[T]he claimant also reported she suffers from headaches "every day," stating she sometimes wakes up with a headache. *However*, the claimant then stated she can sometimes "get rid of it" with aspirin.

The claimant also reported pain in her lower back and her neck, stating she has spasms in her neck. *However*, once again, the claimant reported she has not undergone any surgery on her neck or back.

Aplt. App., Vol. 3 at 469-70 (emphasis added).

Thus, although the ALJ may not have identified any specific incredible statements as part of his evaluation of Ms. Keyes-Zachary's hearing testimony, his approach performed the essential function of a credibility analysis by indicating to what extent he credited what she said when determining the limiting effect of her symptoms. *See Luna*, 834 F.2d at 165-66 (identifying specific factors to be considered in determining whether claimant's testimony concerning effect of symptoms is credible). This approach also supports his ultimate conclusion that Ms. Keyes-Zachary's statements concerning her symptoms' intensity, persistence, and limiting effects were not fully credible to the extent that they were inconsistent with his RFC assessment.

## D.  Citation to "other reasons" and "other factors"

In his conclusions concerning Ms. Keyes-Zachary's credibility, the ALJ stated:

> [E]ven if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to *other reasons*, in view of the relatively weak medical evidence and *other factors discussed in this decision.* Overall, the claimant's reported limited daily activities are considered to be outweighed by the *other factors discussed in this decision*.

Aplt. App., Vol. 3 at 476 (emphasis added).

Such conclusory analysis, which neither reveals what "other reasons" or "other factors" prompted the ALJ's conclusions, nor is tethered to specific evidence, constitutes the type of disfavored boilerplate this court rejected in *Hardman*, 362 F.3d at 678-79 (in assessing a claimant's credibility, "the use of standard boilerplate language will not suffice" (internal brackets and quotation marks omitted)).  But use of such boilerplate is problematic only when it appears "in the absence of a more thorough analysis."  *Id.* at 679.  In this case, the ALJ's decision referred to specific evidence in support of its conclusions.

As noted earlier, the ALJ discussed Ms. Keyes-Zachary's testimony and described certain limitations and qualifications regarding her statements about her symptoms.  In addition, he analyzed the medical evidence in some detail, including records that showed:

- As of December 1, 2002, she had only a small amount of effusion present in her right knee; a negative straight leg raise; and only mild degenerative changes in her right knee with a possible meniscus tear;

- An examination on November 18, 2003, revealed "mild cervical strain type symptoms";

- Her physical therapy in 2004 resulted in progress with increased range of motion;

- An MRI of the thoracic spine on September 22, 2004, was entirely normal;

- X-rays taken February 10, 2005, of her lumbar spine revealed only mild degenerative changes; and

- X-rays on January 10, 2007 of the cervical spine, were negative, and those of the lumbar spine revealed only mild degenerative changes.

The ALJ also detailed many other medical observations reflecting only limited impairment.

Thus, the ALJ did not merely rely on boilerplate language in explaining his conclusions. In this context, use of language referring to "other reasons" or "other factors" does not constitute reversible error.

### E. Persistence of pain complaints and use of medication

Ms. Keyes-Zachary complains that the ALJ ignored the consistency and sheer quantity of her complaints to her physicians about pain, and failed to evaluate the evidence that her doctors frequently prescribed her medications for her pain. But this argument about consistency fails to consider that the ALJ rejected her complaint of disabling pain because of lack of *intensity*, not lack of *persistence*. *See* Aplt. App. at 475-76 ("The Administrative Law Judge does not discount all of the claimant's complaints [of pain]. However, an individual does not have to be entirely pain free

in order to have the residual functional capacity to engage in substantial gainful activity.").

Concerning Ms. Keyes-Zachary's use of medication, the ALJ stated, "The record also indicates the claimant has been prescribed and has taken appropriate medications for her alleged impairments, which weighs in the claimant's favor, but the medical reports reveal that the medications have been relatively effective, when taken as prescribed." *Id.* at 476. Thus, the ALJ did credit her with ongoing use of medication to relieve her symptoms.

### F. Evaluation of knee and back impairments

The ALJ noted that when examined on December 1, 2002, Ms. Keyes-Zachary was observed to have only "a small amount of effusion present" in her right knee. *Id.* Vol. 3 at 471. Ms. Keyes-Zachary asserts that "a small effusion and even mild degenerative changes on an x-ray are still objective medical evidence of abnormalities supporting [her] credibility." Aplt. Br. at 27-28. She also argues that "[l]ater knee x-rays demonstrated an effusion to still be questionably present." *Id.* at 28. Ms. Keyes-Zachary has accurately summarized the later x-ray results: they state "[t]here is *questionable* evidence of a suprapatellar joint effusion." Aplt. App., Vol. 2 at 270 (emphasis added). The problem with this argument is that the ALJ never said that he was discounting her knee problems altogether based on these two x-ray results. She fails to show that any discounting of these problems based on the

- 25 -

mostly negative x-rays represented a mischaracterization or misuse of the medical evidence.

Ms. Keyes-Zachary also complains that the ALJ improperly discounted a second set of knee x-rays. In September 2006 a radiologist x-rayed both her knees and reported:

> Degenerative changes are seen bilaterally. There is medial compartment narrowing also seen bilaterally. There is incomplete fusion of the tibial epiphysis bilaterally.
>
> RIGHT KNEE: No fracture or dislocation is evident. No joint effusion is seen. A small superior patellar osteophyte is noted. Enthesophyte is seen involving the inferior portion of the patella. A small bone island is noted in the proximal tibia.
>
> LEFT KNEE: A small superior patellar osteophyte is identified. An enthesophyte involves the superior portion of the patella.

*Id.* at 286.

The ALJ characterized these x-rays as follows: "There was no significant pathology revealed in either knee." *Id.*, Vol. 3 at 475. Citing medical-dictionary definitions of the terms used by the radiologist, Ms. Keyes-Zachary complains that the ALJ's conclusion ignores that there is "significant pathology present on [her] x-rays to explain her pain." Aplt. Br. at 28.

As the ALJ noted, however, these x-rays were taken in connection with a consultative examination performed by Dr. Reddy. Dr. Reddy's medical-source statement said that while Ms. Keyes-Zachary had tenderness over her patella, she demonstrated normal walking in his office and was capable of sitting, standing, or

walking for eight hours at a time. In light of these medical opinions, the ALJ's conclusion that the pathology revealed on the x-rays was "not significant" from a medical standpoint is supported by substantial evidence.

Ms. Keyes-Zachary next complains of the ALJ's commentary about her back problems. She lists some observations by the ALJ about certain medical evidence, along with some later medical records that showed what she characterizes as degenerative changes in her spine. She concludes that "the progression of degenerative changes again supports a worsening of her condition which supports her credibility, not detracts from it." *Id.* at 29. Ms. Keyes-Zachary identifies no specific statement to the contrary by the ALJ. We discern no reversible error.

### G. ALJ's discussion of activities of daily living

Ms. Keyes-Zachary begins this argument by listing her ADLs, and noting that none of them preclude her from disability. The ALJ also listed her ADLs, but he did not specifically rely on her ability to do them to conclude that she could perform substantial gainful activity. Instead, he found he could not put much weight on her limited ADLs because the limitations to which she testified could not be factually verified, and she had failed to show that her limited ADLs were due to her alleged impairments. He also commented that "the restrictions [on her ADLs] appear to be self-imposed." *Id.* at 475.

Ms. Keyes-Zachary takes issue with this last conclusion. She contends that the ALJ engaged in "rank speculation," Aplt. Br. at 31, in determining that her

limitations were self-imposed.  She argues that the evidence shows that her limited ADLs are due to her impairments rather than her own choice to limit her daily activities.  The ALJ, however, was free to resolve evidentiary conflicts because there is substantial evidence to support his conclusion.

Ms. Keyes-Zachary also complains that the ALJ failed to identify any evidence to support his conclusion that the limitations in her daily activities are "not consistent" with the medical and nonmedical evidence.  Aplt. App., Vol. 3 at 475-76.  It is true that the ALJ should link his findings closely with the evidence and avoid making conclusions in the guise of findings.  *See Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[An ALJ's] findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." (internal quotation marks omitted)).  Here, however, the ALJ's findings were closely enough linked to the evidence to pass muster.

### H.  ALJ's discussion of past relevant work

The ALJ stated:  "While the claimant testified that she had been in special-education classes for reading and spelling, some of her successful past relevant work was semi-skilled and skilled work activity based on vocational expert testimony." Aplt. App., Vol. 4 at 475.  Ms. Keyes-Zachary complains that the medical evidence shows that she had a low intelligence quotient (IQ), with a full scale score authenticated at 84, in the borderline mental retardation range.  But this in no way detracts from the ALJ's point, which is that she was actually *performing* semi-skilled

and skilled work in the past. This is true regardless of what her measured IQ happened to be. The disability inquiry has to do with what kind of substantial gainful work the claimant can *do*, not just with her numerical scores.

Ms. Keyes-Zachary also asserts that the ALJ's finding that she could not return to her past relevant work (PRW) was inconsistent with his use of that same past relevant work to show that her low IQ was not a problem. This assumes that the ALJ thought that the reason she could not go back to work was her low IQ. In his decision, however, the ALJ stated that Ms. Keyes-Zachary could not return to her PRW because (according to the vocational expert who testified at the hearing), her PRW was inconsistent with her RFC. Her RFC, as detailed in the ALJ's decision, contains both mental and physical limitations. It is clear from the VE's testimony, however, that her PRW was eliminated because of the physical requirements of the RFC, not her mental abilities. Therefore, there is no merit to her argument that her inability to do her PRW is inconsistent with the ALJ's findings about her limited IQ.

### I. Side effects of medications

Ms. Keyes-Zachary challenges the ALJ's statement that she had "reported no side effects" from her medications. *Id*, Vol. 3 at 476. His statement is only partially true. At the hearing she testified:

> Q    Do any of the medications you take now or have taken in the past cause you to have any side effects or allergic reactions?
>
> A    *No*. I have taken Vistaril and had to quit taking it because it felt like somebody was setting [sic] on my chest.

*Id.*, Vol. 5 at 992 (emphasis added).

- 29 -

But, as the Commissioner points out, the only allegation here is that Ms. Keyes-Zachary discontinued one medication that was causing her trouble. She has not alleged any adverse effect on her ability to work because of her discontinuance of this medication. Although the ALJ did not mention this alleged side-effect, his failure to do so would not have affected the outcome in this case. The alleged error is harmless.

### J. Motivation to work

Ms. Keyes-Zachary notes that after she injured herself on the job in 2001, she returned to the workforce. She contends that because of this, the ALJ should have considered her "motivation to work" as a positive credibility factor. The record shows that after her accident she worked for three months at a liquor store. She quit because of pain caused by the work and because she needed to get away from an alcoholic with whom she was living at the time. She apparently did not work again after that. She did not even mention this short-term job until the ALJ prompted her about it. The ALJ's failure to consider her to be motivated to work because of a three-month stint at a liquor store does not constitute reversible error.

The judgment of the district court is AFFIRMED.