**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 10, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

NORBERT SCOTT,

    Plaintiff - Appellant,

v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

    Defendant - Appellee.

No. 16-1440
(D.C. No. 1:15-CV-01575-LTB)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **KELLY**, **BALDOCK**, and **BRISCOE**, Circuit Judges.
_____

Nichole Maria Scott applied for Social Security disability benefits, alleging

disability beginning March 15, 2010. The Commissioner denied her application

initially and on reconsideration. She received a de novo hearing before an

administrative law judge (ALJ), who concluded she was not disabled. The Appeals

Council denied review, making the ALJ's decision the Commissioner's final

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

decision. Ms. Scott then sought review in district court, which affirmed the Commissioner's decision. We now affirm the district court's judgment.[1]

## BACKGROUND

In her decision, the ALJ determined that Ms. Scott had the severe impairments of Chronic Cervical Myofascial Pain, Mild Right Carpal Tunnel Syndrome, Migraine Headaches, Major Depressive Disorder, and General Anxiety Disorder, but that her impairments, singly or in combination, did not meet or medically equal a listed impairment. The ALJ further determined that Ms. Scott retained the residual functional capacity (RFC) to perform light work, subject to the following conditions and limitations:

- The claimant can never climb ladders.
- The claimant can frequently climb stairs.
- The claimant has no limits on balancing.
- The claimant can frequently kneel, stoop, crouch, and crawl.
- The claimant should avoid concentrated exposure to loud noise, such as a factory setting or traffic.
- The claimant should avoid unprotected heights and hazardous machinery.
- The claimant is able to understand and remember moderately complex instructions, i.e., that can be learned and mastered within six months.

---

[1] During the course of district court proceedings, Ms. Scott died. The district court granted the uncontested motion of her surviving spouse, Norbert Scott, for substitution as the plaintiff in this action. He is also the appellant in this appeal. *See* Fed. R. Civ. P. 25 (authorizing substitution of proper party for decedent); *Sousa v. Callahan*, 143 F.3d 1240, 1242 n.5 (9th Cir. 1998) (approving substitution of surviving spouse under 42 U.S.C. § 404(d)). In this decision, we refer to "Mr. Scott" and "Ms. Scott" as appropriate.

2

• The claimant can sustain concentration, persistence, and pace for these instructions in a low stress environment, i.e. an environment in which work duties do not require interaction with the general public.

• The claimant can interact appropriately with supervisors and co-workers in the low stress environment.

• The claimant can tolerate work changes consistent with semi-skilled work.

• The claimant can travel.

• The claimant can recognize and avoid work hazards.

Aplt. App. Vol. 1 at 53.

Given these limitations, the ALJ determined that Ms. Scott could perform her past relevant work as a Plastics Molder. She also determined there were other jobs existing in significant numbers in the national economy that Ms. Scott could perform, considering her age, education, work experience, and RFC. The ALJ identified representative jobs, including Companion, Collator Operator, and Small Products Assembler. She concluded that Ms. Scott had not been under a disability, as defined in the Social Security Act, from March 15, 2010, through the date of her decision.

## DISCUSSION

"We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).

We address only those issues preserved in the district court and adequately presented for our appellate review. *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004). These include (1) whether the ALJ applied the correct legal standards in determining the weight to be given to the opinions of Ms. Scott's treating psychiatrist, Dr. Clark Jennings; and (2) whether the ALJ properly evaluated Ms. Scott's credibility.[2]

### 1. Assessment of Dr. Jennings' Opinion

On February 16, 2013, Clark L. Jennings, M.D., Ms. Scott's treating psychiatrist, completed a questionnaire concerning her mental impairments, which he identified as major depression, generalized anxiety, and insomnia. He assigned her a current Global Assessment of Functioning (GAF) score of 50, and opined that her

---

[2] In his opening brief, Mr. Scott argues that the ALJ improperly relied on opinions from agency physician Dr. Gottlieb and treating physician Dr. Griffis in formulating her RFC assessment. Aplt. Opening Br. at 24-29; 36-37. The Commissioner responds that Mr. Scott has waived issues relating to these two non-treating physicians' opinions by failing to raise them in district court. Mr. Scott argues that he preserved his arguments as part of his attack on the ALJ's RFC assessment. Although he presented an argument about Dr. Gottlieb's opinion in his district court briefing, *see* Aplee. Supp. App. at 18, it is not the same argument as he presents on appeal. Mr. Scott may not raise new, specific grounds of attack never presented to the district court. *See, e.g.*, *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1284 (10th Cir. 2013) (stating our forfeiture-and-waiver rule applies even "when a litigant changes to a new theory on appeal that falls under the same general category as an argument presented at trial." (internal quotation marks omitted)). We therefore decline to consider the attacks on the use of Dr. Gottlieb and Dr. Griffis's opinions to support the ALJ's RFC assessment.

4

highest GAF score in the past year had also been 50.[3]  After describing the clinical findings on which he relied ("psychomotor slowing," "depressed/anxious affect" and "executive cognitive slowing"), Ms. Scott's prognosis ("chronic illness"), and her signs and symptoms, he checked boxes on the questionnaire form describing her specific mental abilities and aptitudes.

The boxes he checked indicated she had serious limitations in every ability or aptitude included on the form involving unskilled work.  Specifically, Dr. Jennings assessed that Ms. Scott's abilities to "remember work-like procedures," "understand and remember very short and simple instructions," "carry out very short and simple instructions," "make simple work-related decisions," "ask simple questions or request assistance," and "be aware of normal hazards and take appropriate precautions" were all "seriously limited, but not precluded."  Aplt. App., Vol. 3 at 434 (initial capitalizations omitted).  He determined that she was "unable to meet competitive standards" in her ability to "maintain attention for two hour segment," "maintain regular attendance and be punctual within customary, usually strict tolerances," "sustain an ordinary routine without special supervision," "work in coordination with or proximity to others without being unduly distracted," "complete a normal workday and workweek without interruptions from psychologically based symptoms,"

---

[3] "The GAF is a 100–point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning."  *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012).  A score of 50 would indicate that the person functions on the borderline between moderate and serious symptoms.  *See id.*

5

"perform at a consistent pace without an unreasonable number and length of rest periods," "accept instructions and respond appropriately to criticism from supervisors," "get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes," "respond appropriately to changes in a routine work setting," and "deal with normal work stress." *Id.* (initial capitalizations omitted).

Dr. Jennings was even more pessimistic about Ms. Scott's mental abilities and aptitudes for semiskilled or skilled work. He concluded she was "unable to meet competitive standards" in her abilities to "understand and remember detailed instructions," "carry out detailed instructions," "set realistic goals or make plans independently of others," and "deal with stress of semiskilled and skilled work." *Id.* at 435 (initial capitalizations omitted). On the other hand, he concluded that she had "limited but satisfactory" ability to "interact appropriately with the general public," "maintain socially appropriate behavior," "adhere to basic standards of neatness and cleanliness," and "travel in [an] unfamiliar place," and that her ability to "use public transportation" was "seriously limited, but not precluded." *Id.* (initial capitalizations omitted). He explained these limitations as follows: "The patient's chronic depression and anxiety impair her executive cognitive function such that she is unable to sustain focus for [more than one hour at a time]." *Id.* He also opined that her chronic pain aggravated her depression. Finally, he concluded that her impairments or treatment would cause Ms. Scott to be absent from work more than four days per month.

6

The ALJ must follow a specific procedure when weighing a treating physician's opinion. *Mays v. Colvin*, 739 F.3d 569, 574 (10th Cir. 2014). First, she is required to "consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." *Id.* (internal quotation marks omitted). If it is, she must then "confirm that the opinion is consistent with other substantial evidence in the record." *Id.* (internal quotation marks omitted). "If the opinion is deficient in either of these respects, then it is not entitled to controlling weight." *Id.* (brackets and internal quotation marks omitted). But even "if the ALJ does not assign controlling weight to a treating physician's opinion, it is still entitled to deference and subject to weighing under the relevant factors [listed in] 20 C.F.R. § 404.1527." *Id.*

As part of this process, the ALJ must give "good reasons" for her decision "that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating source's medical opinion and the reason for that weight." *Newbold v. Colvin*, 718 F.3d 1257, 1265-66 (10th Cir. 2013) (ellipsis, brackets, and internal quotation marks omitted). When reviewing the language an ALJ used, we do not discard our common sense. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012) ("In conducting our review, we should, indeed must, exercise common sense.").

The ALJ followed this process, and assigned little weight to Dr. Jennings' opinions stated on the questionnaire. First, addressing his GAF score of 50, she stated that such a score "is merely a snapshot . . . [that] may vary from day to day,

7

time to time, and from one evaluator to another." Aplt. App., Vol. 1 at 57. She then discounted the score because Dr. Jennings did not provide a narrative explanation to support it and because it was lower (indicating more serious impairment) than the GAF score of 55 assigned to Ms. Scott upon her discharge from the hospital after her suicide attempt. The ALJ concluded that "[t]his contradiction diminishes the credibility of Dr. Jennings' assessment." *Id.*

Mr. Scott argues the ALJ's reasoning is illogical because after acknowledging that a GAF score may differ from day to day and clinician to clinician, the ALJ relied on the fact that Dr. Jennings' assigned score differed by a mere five points from a prior score as a reason to discount his entire opinion. But we disagree with Mr. Scott's interpretation of the ALJ's decision. A reasonable and appropriate reading of the ALJ's decision is that when she referred to the credibility of Dr. Jennings' "assessment," she meant the GAF score itself, not his entire medical opinion. Thus, we need only consider whether the prior, higher GAF score undermined the reliability of Dr. Jennings' GAF score. We conclude that it did.

Mr. Scott essentially argues that there was no contradiction between Dr. Jennings' GAF score of 50 and the prior hospital score of 55, because GAF scores can differ from day to day or from clinician to clinician. This argument actually reinforces the ALJ's point that GAF scores are highly subjective and, when unaccompanied by any narrative explanation, are not entitled to much weight. Although the ALJ recognized that a difference in GAF scores *can* be attributed to mere fluctuation or subjective factors, she drew a reasonable inference that a GAF

8

score issued at the time when the medical evidence indicated Ms. Scott had just been released from the hospital after a suicide attempt would ordinarily be lower than one issued several months later, during which she had not been re-hospitalized. Mr. Scott offers no reason why this was not a reasonable inference for the ALJ to draw from the medical evidence, particularly where Dr. Jennings supplied no narrative explanation for his GAF score that would have supported a different conclusion.

The ALJ further rejected the opinions expressed in the boxes Dr. Jennings checked on the form, because she found they were both inconsistent with Ms. Scott's self-reported level of functioning and activities of daily living, and inconsistent with her other medical records. Mr. Scott complains that the ALJ denied Dr. Jennings' opinion controlling weight, merely because it was registered on a "check sheet." Aplt. Opening Br. at 17. Although the ALJ did refer to the form as a "check-sheet," she supplied detailed, specific reasons for the weight she assigned to the opinion. Among other things, she noted that the check-sheet "did not provide a substantive explanation for the results checked," and "appear[ed] to be heavily based on the claimant's self-reported symptoms, rather than any objective evidence." Aplt. App., Vol. 1 at 58.

The ALJ noted that "Dr. Jennings has only treated the claimant since April of 2012 and his appointments with her are only 15 minutes in length." *Id.* Mr. Scott argues that this factor should not be used to discount Dr. Jennings' opinion because he likely determined that Ms. Scott only needed medication monitoring, not psychotherapeutic sessions. Nevertheless, the length of the sessions and the

9

treatment relationship were legitimate factors for the ALJ's consideration. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."); *id.* § 404.1527(c)(2)(ii) ("We will look at the treatment the source has provided . . .").

The ALJ also discounted Dr. Jennings' opinion because she found it inconsistent with treatment records from William S. Griffis, D.O., Ms. Scott's pain management doctor, and Dr. Zirkle, her primary care physician. Although Mr. Scott challenges the ALJ's reasoning on this point, he did not make this argument to the district court. Accordingly, we decline to consider it.

Mr. Scott argues that the ALJ erred in determining that Dr. Jennings' opinion was inconsistent with Ms. Scott's own reports of her level of functioning and activities of daily living. The ALJ cited a "Function Report – Adult," Aplt. App., Vol. 2 at 199-208, but did not explain how it was inconsistent with Dr. Jennings' opinion. Admittedly, many of Ms. Scott's statements in this report are consistent with Dr. Jennings' opinion: that she was on multiple medications; that she experienced anxiety; that she had difficulties with concentration, completing tasks, getting along with others, and following instructions; that she avoided people in general and had a hard time dealing with a lot of people in one place; and that she often did not have energy or a desire to get dressed and instead stayed in bed. But she also reported that she helped her children get ready for school; that she needed no special reminders to take care of her personal needs and grooming; that she was able

10

to prepare meals, at her own pace; that she could do some household chores, subject to her pain and to help from family members; that she could drive "when I have no other choice," *id.* at 202; that she could shop for groceries and prescriptions once or twice a week, completing the task in "a couple of hours because it is often overwhelming," *id.*; that she could pay bills, count change, handle a savings account, and use a checkbook or money orders; that she was able to use a budget; that she talked with friends in person or on the phone; occasionally went to children's social activities; and could get along with authority figures. Taking the report as a whole, the ALJ permissibly concluded it was inconsistent with some of the extreme limitations described by Dr. Jennings.

In contrast with Dr. Jennings' opinion, the ALJ gave substantial weight to the opinion of state agency psychological consultant Anthony Gottlieb, M.D. Mr. Scott complains that "Dr. Gottlieb's analysis was a one-time evaluation based on a review of the documents within [Ms. Scott's] claim file." Aplt. Opening Br. at 14. True, but that did not foreclose the ALJ's reliance on it. The ALJ's task is to examine a non-examining physician's report "to see if it outweighs the treating physician's report, not the other way around." *Reyes v. Bowen*, 845 F.2d 242, 245 (10th Cir. 1988) (internal quotation marks omitted). The ALJ properly performed that duty here. She gave specific, legitimate reasons for rejecting Dr. Jennings' opinion, and carefully analyzed Dr. Gottlieb's opinion and its consistency with the evidence.

11

**2. Credibility Assessment**

The ALJ made extensive findings concerning Ms. Scott's credibility. These findings are scattered throughout her decision. When considered together, they demonstrate the ALJ's compliance with her duty to evaluate and discuss factors relevant to the claimant's credibility. *See* SSR 96-7p, 1996 WL 374186, at *4 (requiring ALJ to give "specific reasons . . . supported by evidence in the case record" for her evaluation of claimant's credibility), *superseded by* SSR 16-3p, 2016 WL 1119029 (effective Mar. 28, 2016).

The ALJ concluded that although Ms. Scott's medically determinable impairments could reasonably be expected to cause her alleged symptoms, her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." Aplt. App., Vol. 1 at 54. She first discussed Ms. Scott's reported activities of daily living (ADLs), using the function report which we have detailed above and her hearing testimony. Although Ms. Scott acknowledged engaging in a wide range of activities, she reported significant problems with some of these activities. Mr. Scott argues that these limitations cast serious doubt on the ALJ's conclusion that her ADL report showed she was "very functional with only some minor difficulties." *Id.*

To the extent the ALJ expressed unwarranted optimism about Ms. Scott's abilities, this may in part be due to her vague answers in the function report. The ALJ noted that Ms. Scott was "not very forthcoming with details in her Function Report." *Id.* at 58. For example, she reported that she finished what she started.

*Id.*, Vol. 2 at 204. But she also said her family had to finish the chores she started and that she backed out of activities she had agreed to. She claimed she stayed in her house unless she had a doctor's appointment. But she also said she went outside once or twice a week, went shopping, and attended children's school activities on occasion. She said she made sure the children were fed, but said she only prepared meals once or twice a week. The function report she completed contained many vague terms such as "as much as possible," "sometimes," "not very often," "rarely," or "on occasion." *Id.* at 200-03.

In any event, the ALJ also supplied several other specific reasons for discounting Ms. Scott's credibility. Mr. Scott does not address any of these reasons in his opening brief. Several of them he never addresses at all.

The ALJ noted that Ms. Scott waited almost a month after her hospital discharge to see a therapist. In the reply brief, Mr. Scott complains that the ALJ ignored the fact that when Ms. Scott saw Dr. Zirkle a month after her discharge, she told him that she had "called a couple of psychiatrist[s] but has yet to hear back." *Id.* at 334. Nevertheless, this same record reported Dr. Zirkle's concern that "[d]espite being asked to see a p[sy]chiatrist due to her recent suicide attempt and her psych hospitalization she had not made an appt." *Id.* The delay in making an appointment was a legitimate factor for the ALJ to consider. The ALJ also noted that after her

13

hospitalization, Ms. Scott saw Dona Sanders, L.P.C., but only attended an intake assessment, and she did not follow up with further treatment.[4]

The ALJ also noted:

- "She . . . maintained she was having seizures and submitted a Seizure Questionnaire, while she was aware of the questionable seizure diagnosis," Aplt. App., Vol. 1 at 58;

- "Dr. Jennings . . . repeatedly notes that the claimant exhibits many somatic concerns. . . . She appears to magnify her symptoms," *id.* at 58-59;

- Although "[s]he stated her doctor placed her on a reduced work schedule of 20 to 28 hours per week . . . Dr. Zirkel's treatment notes reflect that it was the claimant who requested a shortened workweek," *id.* at 59;

- Ms. Scott "stated that she finally quit her job because of an increase in her migraine headaches [but] her physician's notes . . . suggest she was terminated," *id.*; and

---

[4] In the reply brief, Mr. Scott explains Ms. Scott's lack of follow-up with Dona Sanders by citing a later medical record from Dr. Jennings, which states "patient *currently* is unable to afford sessions with [Dona] Sanders due to her expensive dental care." Aplt. App., Vol. 3 at 500 (emphasis added). But Dr. Jennings' record is dated October 30, 2013, and the initial intake/assessment with Dr. Sanders was in February 2012. *See id.*, Vol. 2 at 330. The 20-month gap between these events is unexplained. Also, although Ms. Scott did pursue extensive dental treatment, the record seems to indicate that she was not actively obtaining and paying for that treatment between February 2012 and at least April 2013. *See id.*, Vol. 3 at 504 (dental "Patient Notes Master" printout). It may be true that she did not seek dental care during this period because of lack of funds, which could also have impacted her ability to pay Ms. Sanders. But given the lack of clarity in the record regarding whether Ms. Scott could afford mental health care due to dental issues, the ALJ did not err by relying on the fact that she did not follow up with Dona Sanders.

14

- Ms. Scott "collected unemployment insurance through January of 2012 [during her period of alleged disability, which] indicates that she was available for full-time employment," *id.*[5]

The ALJ also noted that Ms. Scott had worked through the period prior to her alleged onset date, even though she was suffering from headaches, neck and back pain during this period, and her pain had not become seriously worse since the alleged onset date. Finally, she noted that Ms. Scott had sought only conservative treatment for her pain. In sum, the ALJ's credibility assessment, while perhaps not perfect, is supported by substantial evidence.

### 3. Conclusion

The district court's judgment affirming the Commissioner's decision is affirmed.

Entered for the Court

Bobby R. Baldock
Circuit Judge

---

[5] In his reply brief, Mr. Scott presents an extended argument concerning whether Colorado's unemployment law permits an individual with a disability to receive unemployment benefits. We decline to consider an argument made for the first time in a reply brief, to which the Commissioner had no opportunity to respond. *See Mays*, 739 F.3d at 576 n.3 ("[W]e do not address this argument because it was raised for the first time in the reply brief.").