[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-12414
Non-Argument Calendar
_____

D.C. Docket No. 8:12-cv-00035-EAK-TBM


NATHANIAL STONE,

                                                        Plaintiff-Appellant,

versus

COMMISSIONER OF SOCIAL SECURITY,

                                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 26, 2014)

Before HULL, MARCUS, and FAY, Circuit Judges.

PER CURIAM:

Nathanial Stone[1] appeals the district judge's order affirming the Social Security Administration's denial of his application for supplemental security income ("SSI"). We affirm.

## I. BACKGROUND

In 2009, Stone filed an application for SSI under Title XVI of the Social Security Act ("Act"). His application was denied. Stone requested and was granted an administrative hearing before an administrative law judge ("ALJ"). The Notice of Hearing sent to Stone included two pages devoted to claimants' rights to representation by an attorney or other qualified person in Social Security proceedings.

During the March 2011 hearing, Stone stated he understood his right to representation and agreed to proceed without a representative. Stone further stated he was not receiving medical treatment for any condition, and he identified no physical problems. Stone testified he was 22 years old, had completed the eleventh grade, and did not have a General Educational Development ("GED") credential. He lived with his parents, who supported him, and his two brothers. He had never lived by himself. On a typical day, Stone watched television, listened to music, and drew. Stone testified he previously had worked as a dishwasher for one or two

---

[1] Stone's first name is also spelled "Nathaniel" in the record.

2

months.  He also had worked as a housekeeper in 2009 for approximately one month.  The ALJ found Stone had no past relevant work.

When asked what medical conditions prevented him from working, Stone responded he had difficulty understanding tasks assigned to him.  He did some housework, including sweeping, and he also raked the yard and did his own laundry.  He did not cook, and he never had tried to obtain a driver's license.  He shopped for groceries approximately once per month.  He used to go to church, but had not done so recently, and he visited with others from time to time.

Stone's mother, Antoinette Stone, testified Stone had been born with a cocaine dependency and had only one kidney.  She did not identify any current kidney problems.  Antoinette Stone said Stone had a very short attention span, which one school had identified as attention deficit disorder ("ADD") and another had identified as specific learning disability ("SLD").  Antoinette Stone testified Stone previously had received SSI benefits until he reached age 18.  She explained Stone had failed to file timely the paperwork needed to continue his benefits beyond age 18.  Stone had been "socially promoted" to the eleventh grade with no grade point average ("GPA"), and school personnel believed he was unemployable.  ROA at 69.  Stone had done well in elementary and middle schools, but when he reached the ninth grade, "it appear[ed] that everything just shut down."  ROA at 69.  When Stone was in the eleventh grade, Antoinette Stone

3

learned he knew no more than he had in the ninth grade.  School personnel told her they could not help him.  Antoinette Stone testified Stone had worked as a dishwasher for approximately three months, until he had been terminated.  At home, Stone raked the yard, took out the garbage, vacuumed, and occasionally raked others' yards for pay.

The ALJ asked a vocational expert ("VE") whether jobs existed in significant numbers in the national economy that Stone could perform, assuming Stone had no exertional limitations, was limited to unskilled work, and was a "younger aged individual" with a limited education and no past relevant work.  ROA at 73.  The VE identified the following jobs: farm worker or helper, office or hotel cleaner, dishwasher, and "maybe some kitchen helper type work."  ROA at 74.  None of those jobs required literacy.  The ALJ asked whether jobs existed that could be performed by a claimant with a severe mental impairment, who could not concentrate or attend to basic job tasks.  The VE identified no jobs.  When given the opportunity, neither Stone nor Antoinette Stone asked the VE any questions.

Stone also submitted several documents supporting his application.  In 1996, while Stone was in the first grade, school psychologist, Vicki Mayes, prepared a Psychological and Learning Analysis Report.  Stone had been referred for an evaluation because of academic difficulties.  Mayes reported Stone's overall cognitive ability was in the average range, in the thirty-fifth percentile for his age.

4

Stone's short-term memory was strong, but he had significant difficulties in abstract visual analysis and synthesis, and a cognitive deficit in auditory processing. Mayes noted "significant ability/achievement discrepancies . . . in the areas of Broad Reading, Basic Reading Skills and Reading Comprehension." ROA at 218. Stone's other skills and abilities were "within the expected range for the general intellectual development." ROA at 218.

An Exceptional Student Education Department Individual Educational Plan ("IEP") was prepared in 2006, while Stone was in the tenth grade. The IEP identified Stone's "Primary Exceptionality" as "Specific Learning Disabilities." ROA at 207. The IEP reported Stone was functioning at a sixth-grade level in reading and math, had a GPA of 1.0, and lacked employability skills. Effective August 2006, he had been reassigned to a "special diploma option." ROA at 207. According to the IEP, Stone did not "currently express himself in the academic setting," and did not communicate effectively in group settings. ROA at 208. "Due to lack of consistent attendance," he was "incapable of maintaining passin[g] grades in the general education setting." ROA at 209. The IEP provided for several accommodations, including (1) repeating, clarifying, or summarizing instructions; (2) providing verbal encouragement; and (3) providing cues to maintain attention to tasks. A "Disability Report" that appears to have been completed by Stone or on his behalf in 2009 asked: "Why did you stop working?"

ROA at 143.  The response stated: "Over[-]slept.  Did not get up and go to work."

ROA at 143.

In July 2009, consultative examiner Linda Appenfeldt, Ph.D., performed an

evaluation of Stone.  Dr. Appenfeldt reported Stone had "[a] poverty of speech"

and "was slow in his presentation and interactions."  ROA at 221.  Dr. Appenfeldt

detected "a faint smile" when Stone gave "incorrect answers," such as when he

said a bird has four legs.  ROA at 221.  Stone, however, correctly identified the

current United States president.  Dr. Appenfeldt reported intelligence quotient

("IQ") scores, based on the Wechsler Adult Intelligence Scale, fourth edition:

(1) verbal comprehension: 50; (2) perceptual reasoning: 50; (3) working memory:

50; (4) processing speed: 50; and (5) full-scale IQ: 41.  All scores were in the first

percentile, and Stone's full-scale IQ score was in the extremely low range of

intelligence.  Dr. Appenfeldt stated the results "should be used with caution, as

they are believed to significantly underestimate [Stone]'s true abilities and

[Dr. Appenfeldt] question[ed] the reliability and validity of the scores."  ROA at

223.  Dr. Appenfeldt assigned Stone a Global Assessment of Functioning

("GAF")[2] score of 50.  Dr. Appenfeldt stated she was "not convinced of the

---

[2] The GAF is a 100-point scale divided into 10 numerical ranges, which permits clinicians to assign a single-ranged score to a person's psychological, social, and occupational functioning.  *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012) (citing Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000)).  GAF scores of 41 to 50 indicate serious symptoms (suicidal ideation, severe obsessional rituals, or frequent shoplifting) or any serious impairment in social, occupational, or

severity of [Stone's] impairments, as he has presented them. There is the consideration Nathaniel Stone is exaggerating and magnifying problems in order to obtain financial compensation for himself with secondary gains operating." ROA at 223.

In September 2009, state agency consultant Arthur Hamlin, Psy.D., completed a psychiatric review technique form ("PRTF") for Stone. Dr. Hamlin reported Stone suffered from the following, which Dr. Hamlin categorized as "Not Severe": (1) an "Organic Mental Disorder[]," which Dr. Hamlin described as "learning disability by history"; and (2) a "Personality Disorder[]," which Dr. Hamlin described as "oppositional defiant disorder." ROA at 225-26, 232. Addressing the paragraph B criteria listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"), Dr. Hamlin explained Stone experienced no restrictions in the activities of daily living; mild difficulties in maintaining social functioning and concentration, persistence, or pace; and no extended episodes of decompensation. Stone did not satisfy any of the criteria in paragraph C of the Listings.

---

school functioning (having no friends or being unable to keep a job); scores of 51 to 60 indicate moderate symptoms (flat affect and circumstantial speech or occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (having few friends or conflicts with peers or coworkers). *Id.*

In May 2010, state agency consultant Nancy Dinwoodie, M.D., also completed a PRTF for Stone. Dr. Dinwoodie also reported Stone suffered from a "Not Severe" "Organic Mental Disorder[]," which she described as a "learning disorder [not otherwise specified] with average intelligence." ROA at 239-40. Addressing the paragraph B criteria of the Listings, Dr. Dinwoodie found Stone experienced no restrictions in daily living activities or difficulties in maintaining social functioning, concentration, persistence, or pace; and no extended episodes of decompensation. Dr. Dinwoodie did not address the paragraph C criteria.

The ALJ concluded Stone had not been disabled under the Act, since he had filed his application. The ALJ determined Stone had not engaged in substantial gainful activity since the date of his application. He had two medically determinable impairments: questionable learning disorder and oppositional traits. Stone, however, did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months. Therefore, he did not have a severe impairment or combination of impairments.

The ALJ noted Stone's medically determinable impairments reasonably could be expected to produce some of the alleged symptoms, but Stone's statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible. The ALJ discussed the reports prepared by Mayes in

8

1996, and by Dr. Appenfeldt in 2009. The ALJ also reported Stone had been "very unresponsive" during his hearing, and determined the activities reported by Stone and his mother did not support a finding of "total disability." ROA at 51. Stone's employment had been terminated in June 2009, because he had overslept and did not go to work, and not because of cognitive issues. Stone also had no severe physical impairments.

The ALJ gave great weight to Dr. Appenfeldt's opinion, which the ALJ found to be consistent with Stone's performance during his consultative examination, Mayes's 1996 report, Stone's reported activities, and Stone's unresponsiveness during his hearing. The ALJ acknowledged Dr. Appenfeldt had assigned Stone a GAF score of 50, but also noted Dr. Appenfeldt had not been convinced of the severity of Stone's impairments as he presented them and believed Stone may have been exaggerating his problems. The ALJ gave great weight to the state agency consultants' assessments, which the ALJ found to be consistent with the record as a whole. Regarding the paragraph B criteria of the Listings, the ALJ concluded Stone had (1) no restrictions in daily-living activities; (2) no more than mild limitations in social functioning, concentration, persistence, or pace; and (3) no extended-duration episodes of decompensation. Consequently, Stone's medically determinable mental impairments were non-severe, under 20

9

C.F.R. § 416.920a(d)(1). The Appeals Council denied Stone's counseled request for review.

In district court, Stone filed a memorandum in which he argued the record showed he had a severe impairment and lacked employability skills. A magistrate judge issued a report and recommendation ("R&R"), recommending the ALJ's decision be affirmed. The magistrate judge concluded nothing in the record showed Stone suffered from an intellectual disability[3] or borderline intellectual functioning. The magistrate judge concluded the ALJ fairly addressed the record evidence and substantial evidence supported the ALJ's determination, because Stone's IQ score was considered invalid, and there was no indication his GAF score signified an inability to work. In his objections to the R&R, Stone argued his "IQ score of 41 was valid and accurate and there is nothing in the record to detract from such score." ROA at 353.

The district judge overruled Stone's objections, adopted the R&R, and affirmed the denial of Stone's request for SSI. The judge concluded Stone knowingly had waived his right to representation during his hearing and the ALJ's duty to develop the record did not rise to the level of a "special duty." ROA at 360. Stone had the opportunity to obtain and present additional records, but failed

---

[3] A rule adopted on August 1, 2013, replaced the term "mental retardation" with "intellectual disability" in the Listings. *See* 78 Fed. Reg. 46,499, 46,501-02 (Aug. 1, 2013). Consequently, the terms "intellectual disability" and "intellectual-disability listing" are used in this opinion.

to do so.  Stone did not meet the intellectual-disability listing, because the record did not show adaptive deficits; once the VE testified an individual with Stone's limitations could find jobs in the national economy, the burden shifted back to Stone to show he could not perform those jobs.

On appeal, Stone argues the ALJ's hypothetical improperly failed to include Stone's difficulties with concentration.  He asserts his school records, which show he has difficulty reading and lacks employability skills, are sufficient to establish a severe mental impairment.  When combined with his limited reading and math abilities, his inability to graduate from high school, and the finding that he is unemployable, this impairment, Stone argues, shows he cannot sustain any form of work under Social Security Ruling ("SSR") 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).  Stone contends the fact he gave one questionable answer during Dr. Appenfeldt's examination should not call into question his IQ score.  He argues the ALJ had a "special duty" to protect him and develop the evidence for and against him, because he was unrepresented.  Appellant's Br. at 16.  Stone contends the ALJ improperly gave significant weight to the opinions of non-examining state agency doctors and erroneously determined Stone did not satisfy the fourth step of the sequential analysis.  He also asserts the ALJ ignored his prior benefits award and GAF score.

11

## II. DISCUSSION

We review the Commissioner's decision for substantial evidence. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Substantial evidence is "more than a scintilla" and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. *Id.* (citation and internal quotation marks omitted). We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner. *Id.* Even if the evidence preponderates against the Commissioner's factual findings, we must affirm if the decision reached is supported by substantial evidence. *Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005) (per curiam).

The ALJ must state specifically the weight accorded to each item of evidence and why a decision was reached. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985) (per curiam). Similarly, the ALJ must state with particularity the weight given to different medical opinions and the reasons for them. *Winschel*, 631 F.3d at 1179. Generally, a treating doctor's opinion is entitled to more weight than that of a consulting doctor. *Spencer ex rel. Spencer v. Heckler*, 765 F.2d 1090, 1093-94 (11th Cir. 1985) (per curiam). Reports of non-examining physicians, taken alone, do not constitute substantial evidence. *Id.* at 1094. Nevertheless, an ALJ may rely on opinions of non-examining sources when they

12

do not conflict with those of examining sources.  *See Edwards v. Sullivan*, 937 F.2d 580, 584-85 (11th Cir. 1991).

The Commissioner uses a five-step, sequential evaluation process to determine whether a claimant is "disabled" for purposes of eligibility for SSI.  20 C.F.R. § 416.920(a)(4); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The first three steps ask whether the claimant (1) currently is engaged in substantial gainful activity and (2) has a severe impairment or combination of impairments (3) that meets or equals the severity of the specified impairments in the Listings.  20 C.F.R. § 416.920(a)(4)(i)-(iii); *Crayton*, 120 F.3d at 1219.  The fourth step asks whether, based on a claimant's residual functional capacity ("RFC") assessment, the claimant can perform any of his past relevant work.  20 C.F.R. § 416.920(a)(4)(iv); *Crayton*, 120 F.3d at 1219.  The final step asks whether there are significant numbers of jobs in the national economy the claimant can perform, given his RFC, age, education, and work experience.  20 C.F.R. § 416.920(a)(4)(v); *Crayton*, 120 F.3d at 1219.

An impairment or combination of impairments is "severe" if it significantly limits the claimant's physical or mental abilities to perform basic work activities.  20 C.F.R. §§ 416.920(c), 416.921(a); *Crayton*, 120 F.3d at 1219.  Basic work activities include understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers

and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. § 416.921(b)(3)-(6).

The claimant bears the burden of proving he has a severe impairment or combination of impairments.  *See McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).  If the claimant does not have a severe impairment or combination of impairments, he is not disabled.  *Id.* (citing 20 C.F.R. § 416.920(c)).  An impairment or combination of impairments is not severe if it is a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the claimant's physical or mental abilities to work, irrespective of age, education, or work experience.  *See Bridges v. Bowen*, 815 F.2d 622, 625-26 (11th Cir. 1987) (per curiam).  A claimant need show only that his impairment is not so slight, and its effect is not so minimal.  *McDaniel*, 800 F.2d at 1031.  The claimant's burden at step two is mild, since this inquiry "allows only claims based on the most trivial impairments to be rejected." *Id.*

The mental-disorders listings generally contain (1) an introductory paragraph describing the disorder(s) addressed by the listing; (2) a set of medical findings, referred to as the "paragraph A criteria"; (3) a set of impairment-related functional limitations, referred to as the "paragraph B criteria"; and, in some cases, (4) additional functional criteria, referred to as the "paragraph C criteria." *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A).  For an impairment to meet one of

these listings, it must satisfy both the diagnostic description in the introductory paragraph and the criteria for both paragraphs A and B, or A and C, when appropriate. *Id.*

Severity is measured "according to the functional limitations imposed by [one's] medically determinable mental impairment(s)." *Id.* pt. 404, subpt. P, app. 1, § 12.00(C). Functional limitations are assessed using the four paragraph B criteria: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.*; *see also id.* § 416.920a(c)(3). A mental impairment generally is considered non-severe under step two if the degree of limitation in the first three paragraph B criteria is rated as "none" or "mild" and there have been no episodes of decompensation. *Id.* § 416.920a(d)(1).

The ALJ has a basic obligation to develop a full and fair record. *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). Where a claimant has not waived his statutory right to counsel, this obligation rises to a "special duty" when an unrepresented claimant unfamiliar with hearing procedures appears before the ALJ. *Id.* (citation and internal quotation marks omitted).

Because Stone waived his right to representation during his hearing, his argument that the ALJ owed him a "special duty" to develop the evidence for and against him is misplaced. *See id.* Substantial evidence supports the ALJ's step-two finding that Stone did not meet his burden of showing he had a severe

15

impairment under the Act.  *See* 20 C.F.R. §§ 416.920(a)(4)(ii), (c), 416.920a(d)(1), 416.921(a)-(b); *Winschel*, 631 F.3d at 1178; *Crayton*, 120 F.3d at 1219; *McDaniel*, 800 F.2d at 1030.  Specifically, the ALJ determined Stone had no more than mild restrictions in daily-living activities, social functioning, and concentration, persistence, or pace, and that he had no extended-duration episodes of decompensation.  These determinations were supported by (1) the report of Dr. Appenfeldt, who opined Stone may have been exaggerating his problems; (2) the reports of Dr. Hamlin and Dr. Dinwoodie, both of whom indicated Stone's impairments were not severe, and that Stone experienced no more than mild restrictions in daily-living activities, social functioning, and concentration, persistence, or pace, and had no extended-duration episodes of decompensation; (3) the testimony of Stone and his mother, who reported Stone previously had worked as a dishwasher and housekeeper, engaged in housework, raked yards, did his own laundry, and shopped for groceries; (4) evidence that Stone lost a prior job because he had overslept and did not go to work, and not because of cognitive issues; and (5) the ALJ's finding Stone's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the finding that he had no severe impairment or combination of impairments.  The ALJ was entitled to discount Stone's IQ and GAF scores based on Dr. Appenfeldt's opinion that the scores "significantly

16

underestimate[d]" Stone's abilities, and that Stone may have been exaggerating his impairments intentionally.  ROA at 223.

The record does not support Stone's suggestion that Dr. Appenfeldt called into question the validity of his test scores based on only one questionable answer during his exam.  Dr. Appenfeldt's report explicitly stated she detected a faint smile by Stone, when he gave multiple incorrect answers.  Dr. Appenfeldt also concluded Stone was exaggerating and magnifying multiple problems.  Read in context, Dr. Appenfeldt reported Stone's statement that a bird has four legs as only one example of his questionable answers.  Stone also has not shown the ALJ gave improper weight to the state agency consultants' opinions, which the ALJ found to be consistent with the record as a whole.  *See Edwards*, 937 F.2d at 584-85.

Stone's citation to SSR 96-8p is misplaced.  This Policy Interpretation Ruling addresses the step-four and step-five RFC assessments; therefore, it has no relevance to the ALJ's step-two determination that Stone did not have a severe impairment or combination of impairments.  *See* SSR 96-8p, 1996 SSR LEXIS 5 at *8 ("RFC is an issue only at steps 4 and 5 of the sequential evaluation process.").  Stone's arguments regarding the step-four inquiry likewise are misplaced.  Notwithstanding the ALJ's hypothetical question including a severe mental impairment, the ALJ's ultimate denial of benefits was based on a step-two finding that Stone had not shown a severe impairment or combination of impairments.

17

Although it would have been prudent for the ALJ to have addressed Stone's prior award of benefits as a child, *see Hudson*, 755 F.2d at 786; *Cowart*, 662 F.2d at 735, Stone has advanced no argument on appeal concerning the extent to which, if any, his receipt of benefits as a child may be relevant to his application for benefits as an adult. *See Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008) (per curiam) (explaining a litigant who offers no substantive argument on an issue in his initial brief abandons that issue on appeal); *cf.* 20 C.F.R. § 416.987(a) (explaining eligibility for SSI benefits must be redetermined when a claimant reaches age 18, and that an adult claimant may be found to be not disabled, despite having been eligible for SSI benefits as a child).

**AFFIRMED.**