**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

SCOTTY D. FULTON,

    Plaintiff - Appellant,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security
Administration,

    Defendant - Appellee.

No. 15-6054
(D.C. No. 5:13-CV-01108-HE)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **PORFILIO**, and **PHILLIPS**, Circuit Judges.
_____

Scotty D. Fulton appeals from the district court's judgment affirming the

Commissioner's denial of his applications for disability insurance benefits (DIB) and

supplemental security income (SSI) benefits.  Exercising jurisdiction under 42 U.S.C.

§ 405(g) and 28 U.S.C. § 1291, we affirm.

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
submitted without oral argument.  This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel.  It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

## BACKGROUND

Mr. Fulton applied for DIB and SSI in 2005, alleging he became disabled on January 1, 2003, when he was twenty-nine years old. An administrative law judge (ALJ) denied the claims, but the Appeals Council remanded for a new hearing. The ALJ held a new hearing and again denied benefits. The Appeals Council denied review, but the district court remanded for further proceedings.

On remand, a new ALJ held a hearing and denied benefits.[1] At steps two and three of the agency's familiar five-step sequential evaluation, the ALJ determined that Mr. Fulton had several severe impairments (discogenic and degenerative spinal disorders; major depressive disorder, recurrent and moderate; social phobia; and polysubstance abuse), but none of them (singly or in combination) met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listings). The ALJ found that Mr. Fulton had the residual functional capacity (RFC) to perform sedentary work[2] subject to the following limitations:

> occasionally climb ramps and stairs, balance, and stoop; never climb ropes, ladders, and scaffolds, kneel, crouch, or crawl; avoid exposure to vibration; can sit for about 30 minutes at any one time before standing briefly at the workstation for less than 5 minutes; understand, remember, and carry out only simple instructions; make simple work related decisions; deal with only occasional changes in work processes and environment; should be

[1] For DIB purposes, Mr. Fulton had to show he was disabled on or before his date last insured, December 31, 2006, but the ALJ considered medical evidence up through the date of his decision (August 27, 2013) for the purpose of SSI benefits.

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a).

2

working with things and objects instead of people and, thus, have no contact with the general public and have only incidental, superficial work-related type contact with co-workers and supervisors; and for any work task, should not be required to read above the 6th grade level and should not be required to write or use mathematics above the 3rd grade level.

Aplt. App. Vol. III, Admin. R. at 411.  With this RFC, the ALJ concluded that Mr. Fulton could not perform any of his past relevant work as a fast food cook, prep cook, roofer helper, or housekeeper, but was able to work as a surveillance system monitor or final assembler.  The Appeals Council denied review, and the district court affirmed.  Mr. Fulton appeals.

## DISCUSSION

Our task in this appeal is limited to determining whether substantial evidence supports the agency's factual findings and whether the agency applied the correct legal standards.  *Barnett v. Apfel*, 231 F.3d 687, 689 (10th Cir. 2000).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (internal quotation marks omitted).  We cannot "reweigh the evidence" or "substitute our judgment for that of the agency."  *Id.* (internal quotation marks omitted).

## I.    Mental impairments

### A.  Medical sources

Mr. Fulton contests the ALJ's assessment of reports and opinions by several medical sources concerning his mental impairments.  We address each in turn.

3

### 1. Drs. Lynch and Krieger

Mr. Fulton argues that the ALJ erred in not discussing the diagnosis of an examining, state-agency consultant, Darrell Lynch, Ph.D., and the records of a treating physician, Michael Krieger, M.D. Dr. Lynch concluded that Mr. Fulton has panic disorder with agoraphobia and avoidant personality disorder, *see* Aplt. App. Vol. II, Admin. R. at 192-94, and Dr. Krieger prescribed anti-depressants several times in response to his complaints of depression and anxiety, *see id.* at 230. But neither doctor gave an opinion about the functional limitations, if any, that these conditions imposed (which would be relevant at steps four and five of the sequential evaluation process), and Mr. Fulton has not argued that any of these conditions meets or equals a Listing (which would be relevant at step three). Hence, the diagnoses by themselves are not significantly probative evidence the ALJ had to reject in order to find Mr. Fulton was not disabled, and therefore the ALJ did not need to discuss them. *See Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (explaining that although "an ALJ is not required to discuss every piece of evidence," he must discuss "the evidence supporting his decision, . . . uncontroverted evidence he chooses not to rely upon, [and] significantly probative evidence he rejects").

To the extent Mr. Fulton asserts a step-two error in the ALJ's failure to assess whether his panic disorder with agoraphobia or avoidant personality disorder (as diagnosed by Dr. Lynch) were severe (*see* Aplt. Opening Br. at 23-26), such error was harmless because the ALJ found at least one other severe impairment at step two. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (concluding that a

4

step-two error is harmless where an ALJ properly determines that a claimant cannot be denied benefits at step two and proceeds to step three). Moreover, a nonexamining, state-agency consultant, Karen Kendall, Ph.D., considered Dr. Lynch's diagnoses and expressed opinions on the associated degree of functional limitation. As we proceed to discuss, the ALJ adequately accounted for Dr. Kendall's limitations, and we therefore reject Mr. Fulton's argument that the ALJ erred in not considering what effect, if any, Dr. Lynch's diagnoses had on Mr. Fulton's RFC (*see* Aplt. Reply Br. at 3-5).

## 2. Dr. Kendall

Mr. Fulton claims that the ALJ erred in discussing and weighing Dr. Kendall's opinions regarding his mental impairments. In Section I of a Mental Residual Functional Capacity Assessment form (MRFCA) she completed in January 2006, Dr. Kendall checked boxes indicating that Mr. Fulton was (1) moderately limited in his "ability to work in coordination with or proximity to others without being distracted by them," Aplt. App. Vol. II, Admin. R. at 196; (2) moderately limited in his "ability to respond appropriately to changes in the work setting," *id.* at 197; and (3) markedly limited in his "ability to interact appropriately with the general public, *id.* In Section III of the MRFCA, Dr. Kendall wrote that Mr. Fulton is "able to perform simple and some complex tasks under ordinary supervision," "able to interact with coworkers and supervisors for incidental work purposes but should avoid public contact," and "able to adapt to some work change." *Id.* at 198. In an accompanying Psychiatric Review Technique (PRT) form, Dr. Kendall noted that she

5

had reviewed Dr. Lynch's report, acknowledged his diagnosis of avoidant personality disorder and panic disorder with agoraphobia, and checked boxes indicating Mr. Fulton was moderately limited in activities of daily living and maintaining concentration, persistence, or pace, and markedly limited in maintaining social functioning.

The ALJ purported to give minimal weight to Dr. Kendall's opinions because later medical evidence rendered them "moot." *Id.* Vol. III, Admin. R. at 413. The ALJ mentioned Dr. Kendall's Section III opinion that Mr. Fulton was "capable of simple and some complex work under ordinary supervision," *id.* at 402, but Mr. Fulton criticizes the ALJ's failure to mention the other three limitations Dr. Kendall found in Section I of the MRFCA. This argument overlooks an important distinction between Sections I and III. According to the MRFCA, Section I "is for recording summary conclusions," whereas Section III is for recording a "[d]etailed explanation of the degree of limitation for each [Section I] category." *Id.* Vol. II, Admin. R. at 196. Where a psychologist's Section III narrative does not contradict any Section I limitations and describes the effect each Section I limitation would have on the claimant's mental RFC, the ALJ may properly look to only the Section III narrative as the psychologist's opinion regarding mental RFC. *Carver v. Colvin*, 600 F. App'x 616, 618-19 (10th Cir. 2015).[3] The ALJ did so here, acknowledging in a footnote the distinction between Section I and Section III.

[3] *Carver* is unpublished and therefore not precedential, but we cite it for its persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

*See* Aplt. App. Vol. III, Admin. R. at 413 n.3. And we do not see any contradiction between Sections I and III of Dr. Kendall's MRFCA or any failure to describe in Section III the effects of any Section I limitations on Mr. Fulton's capacity for work.[4] Accordingly, we reject Mr. Fulton's argument that the ALJ erred in not mentioning the three other Section I limitations.

In addition, we conclude that, regardless of the ALJ's statement that he afforded minimal weight to Dr. Kendall's opinions, the ALJ's RFC adequately accounted for all the limitations Dr. Kendall set forth in Section III of her MRFCA. Dr. Kendall thought Mr. Fulton could "perform simple and some complex tasks under ordinary supervision," *id.* Vol. II, Admin. R. at 198; the ALJ limited him to simple work. Dr. Kendall thought Mr. Fulton could "interact with coworkers and supervisors for incidental work purposes but should avoid public contact," *id.*; the ALJ limited him to work lacking any public contact and involving only objects and incidental, superficial work-related contact with coworkers and supervisors. And Dr. Kendall thought Mr. Fulton could "adapt to some work change," *id.*, and the ALJ limited him to "only occasional changes in work processes and environment," *id.* Vol. III, Admin. R. at 411. Because the RFC adequately captured the limitations Dr. Kendall set out in Section III of her MRFCA (and, for that matter, the limitations

---

[4] We view Dr. Kendall's Section III opinion that Fulton has the ability "to interact with coworkers and supervisors for incidental work purposes," Aplt. App. Vol. II, Admin. R. at 198, as adequately describing the effect of the moderate limitation in his "ability to work in coordination with or proximity to others without being distracted by them," *id.* at 196, that Dr. Kendall marked in Section I.

7

she indicated on her PRT form), we need not address Mr. Fulton's other attacks on the ALJ's statement that he would afford Dr. Kendall's opinions minimal weight or that they were moot or of no practical effect. *See* Aplt. Opening Br. at 17-23.

### 3. Case manager Hull

Mr. Fulton takes issue with the ALJ's reasons for affording little weight to the opinion of Mandy Hull, who was his case manager and part of his mental-health treatment team at Red Rock West Behavioral Health Services from September 2010 to September 2011. In Ms. Hull's view, Mr. Fulton had marked restrictions in daily living activities, social functioning, and concentration, and he would be unable to work. The ALJ gave three reasons for affording Ms. Hull's opinion little weight: (1) she was not an acceptable medical source;[5] (2) the ALJ gave greater weight to the opinion of an acceptable medical source, state-agency examining consultant Cynthia Repanshek, Psy. D., that Mr. Fulton had only moderate symptoms; and (3) Ms. Hull's opinion was inconsistent with treatment notes from Red Rock.

In Mr. Fulton's view, the ALJ's second and third reasons are flawed, leaving the fact that Ms. Hull was an unacceptable medical source as the sole, and therefore improper, reason for affording her opinion little weight. We are not persuaded.

---

[5] Acceptable medical sources include licensed physicians and licensed or certified psychologists. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a). "Medical sources who are not 'acceptable medical sources'" include "nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists." SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

First, Mr. Fulton claims that the ALJ failed to weigh Ms. Hull's opinion against medical opinions using the factors of 20 C.F.R. §§ 404.1527(c) and 416.927(c)[6] and therefore violated Social Security Ruling 06-03p, 2006 WL 2329939 (Aug. 9, 2006) (SSR 06-03p). Although those factors "explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,'" they "represent basic principles that apply to the consideration of all opinions from medical sources who are not 'acceptable medical sources.'" *Id.* at *4.[7] But not every factor will apply in every case, *id.* at *5, and an ALJ is not required to expressly discuss those factors in his decision: "In the case of a nonacceptable medical source[,] . . . the ALJ's decision is sufficient if it permits us to 'follow the adjudicator's reasoning.'" *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1164 (10th Cir. 2012) (quoting SSR 06-03p, 2006 WL 2329939, at *6). Here, the ALJ's discussion allows us to follow his reasoning.

---

[6] Those factors are:

(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (quotation omitted).

[7] Under SSR 06-03p, opinions from nonacceptable medical sources "are important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06-03p, 2006 WL 2329939, at *3.

Second, Mr. Fulton contends that the ALJ misread Dr. Repanshek's report as noting moderate symptoms when instead the report's only reference to anything being "moderate" was to the degree of Mr. Fulton's depression. As a matter of semantics, we will not fault the ALJ for interpreting Dr. Repanshek's opinion to mean that Mr. Fulton's "moderate" depression causes some sort of moderate symptoms. Moreover, Mr. Fulton's argument overlooks that Dr. Repanshek also thought he had a GAF score of 56, which indicates moderate symptoms, *see* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., Text Revision 2000), and the ALJ noted that score in his decision, *see* Aplt. App. Vol. III, Admin R. at 406. We therefore see no factual error in this regard.

As Mr. Fulton points out, the ALJ did not expressly discuss the length-of-treatment factor. However, the ALJ did not have to expressly discuss any of the applicable factors. *See Keyes-Zachary*, 695 F.3d at 1164. But even if we equate the ALJ's failure to expressly discuss that factor with a failure to consider that Ms. Hull was part of a team that had more contact with Mr. Fulton than Dr. Repanshek, who examined him only one time, that alone is not a basis to fault the ALJ. SSR 06-03p posits that an ALJ can afford more weight to the opinion of a nonacceptable medical source than to the opinion of an acceptable medical source where the nonacceptable medical source saw the claimant "more often than the treating source *and has provided better supporting evidence* and a better explanation for [the] opinion." SSR 06-03p, 2006 WL 2329939 at *5 (emphasis added). In this regard, the ALJ discussed treatment notes that were inconsistent with Ms. Hull's

10

opinion.[8]  Mr. Fulton does not fault the ALJ's interpretation of those notes but instead argues that the ALJ overlooked his admission and discharge documents, which show that his condition did not change during the one year he was treated at Red Rock.  While that might reflect on the effectiveness of his Red Rock treatment, it is not evidence that supports Ms. Hull's opinion as to the degree of limitations caused by Mr. Fulton's mental impairments.  We further note that the admission document contains summary indications that Mr. Fulton had a variety of impairments and problems, but there is no explanation for these opinions, and they specify no degree of impairment.  The assessment at discharge—that Mr. Fulton is "seriously mentally ill," Aplt. App. Vol. IV, Admin. R. at 569—suffers from these same shortcomings. Accordingly, these documents do not cause us to question the ALJ's decision to give little weight to Ms. Hull's opinion.

Because the record supports the ALJ's additional reasons for affording little weight to Ms. Hull's opinion, it was not improper for the ALJ to also rely on the fact that Ms. Hull was a nonacceptable medical source.  *See* SSR 06-03p, 2006 WL 2329939, at *5 ("The fact that a medical opinion is from an 'acceptable medical

---

[8]  The ALJ accurately observed that those notes showed Mr. Fulton "was compliant with medications, had no side effects, no involuntary movements, and no suicidal ideation"; had an "appropriate physical appearance, normal speech, appropriate affect, and was fully oriented and alert"; "had normal thoughts" without "[d]elusions [or] hallucinations"; and "was cooperative."  Aplt. App. Vol. III, Admin. R. at 414.  "The only symptoms noted were anxious mood" on four occasions, and Mr. Fulton "was able to focus during sessions."  *Id.*

11

source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source[.]'").

## B. Ability to handle stress and to concentrate, persist, or maintain pace

Mr. Fulton faults the ALJ for not adequately considering how his alleged inability to handle stress bears on his ability to work, particularly regarding the final assembler job. He largely relies on a provision of Social Security Ruling 85-15 stating that "the *knowledge* that one's work is being judged and evaluated, even when the supervision is remote or indirect, can be intolerable for some mentally impaired persons," SSR 85-15, 1985 WL 56857, at *6 (1985). He points to statements he made on his benefits application that he is not good with stress and that stress causes problems with memory, concentration, following instructions, and getting along with others; his mother's similar testimony at the ALJ hearing; a 1999 Red Rock evaluation that he had a "low tolerance to stress," Aplt. App. Vol. III, Admin. R. at 257-58; and Dr. Repanshek's comment that "[h]e seems to become angry and agitated in social situations or when he feels that he is being watched or scrutinized," *id.* Vol. IV, Admin. R. at 605. But this evidence says nothing about the degree of his limitations with regard to stress, and as we have already said, the ALJ's RFC adequately accounted for Dr. Kendall's opinion that Mr. Fulton can perform simple tasks under ordinary supervision, interact with coworkers and supervisors for incidental work purposes, never interact with the public, and adapt to some work changes. Accordingly, we see no error with regard to stress.

12

Mr. Fulton similarly criticizes the ALJ for not incorporating any limitation in his RFC finding that accounted for his step-three finding that Mr. Fulton had "no greater than 'moderate' difficulties" with concentration, persistence, or pace. *Id.* Vol. III, Admin. R. at 410. The ALJ apparently based that finding on PRT forms completed by Dr. Kendall in 2006 and Deborah Hartley, Ph.D., in 2011—each found that, for purposes of whether the "paragraph B" criteria of the Listings were met, Mr. Fulton had moderate difficulties in the broad functional area of maintaining concentration, persistence, or pace. However, "paragraph B" limitations "are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996). The MRFCA "used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings." *Id.*

In Section I of the MRFCAs that accompanied their PRT forms, Drs. Kendall and Hartley each checked boxes indicating that Mr. Fulton was not significantly limited in his ability to (1) maintain attention and concentration for extended periods and (2) complete a normal workday without interruptions from the symptoms of his mental impairments and to perform at a consistent pace.[9] They also marked boxes for

---

[9] Those mental activities fall within the MRFCA's broader category of sustained concentration and persistence and appear to be the activities within that category most germane to Mr. Fulton's argument.

13

moderate or marked limitations in other mental activities within that category,

ostensibly representing the moderate difficulties in the related functional area they

marked on their PRT forms for "paragraph B" purposes. Thus, neither Dr. Kendall

nor Dr. Hartley concluded in Section III of their MRFCA (i.e., in their RFC

assessment) that Mr. Fulton had a significant limitation in concentration, persistence,

or pace, and as discussed above, Dr. Kendall's Section III narrative accounted for the

moderate limitation in Mr. Fulton's ability to work alongside others without being

distracted by them that she marked in Section I. Further, Mr. Fulton has not pointed

to any competing evidence supporting a moderate limitation in these abilities for

RFC purposes.[10] Hence, we reject his contention that the ALJ erred by not including

in his RFC finding a moderate limitation in concentration, persistence, or pace.

## II.    Physical impairments

Moving to his physical impairments, Mr. Fulton claims that the ALJ erred in

not addressing the July 2006 findings of Samantha Lewellen, M.D., that he had

tenderness in his lower back and sacroiliac joints, pain radiating into his hips with

straight leg raising, and a gait that favored his right side as evidenced by signs of

wear on his left foot. But Dr. Lewellen did not assess any specific functional

limitations, and in any event, at step two the ALJ found that Mr. Fulton had severe

---

[10] Mr. Fulton directs us to Ms. Hull's opinion that he has marked difficulties in these abilities, but we have already rejected his challenge to the ALJ's finding that her opinion was entitled to little weight. And although Dr. Repanshek opined that Mr. Fulton had moderate depression and a GAF score indicating moderate symptoms, she did not further specify how his mental impairments manifested themselves symptomatically or functionally.

14

spinal disorders, which he accounted for in his RFC finding by limiting Mr. Fulton to

sedentary work with a variety of accommodating postural limitations. Hence any

error in failing to discuss Dr. Lewellen's findings at step two, or as part of the RFC

finding, was harmless.[11] *See Mays v. Colvin*, 739 F.3d 569, 578-79 (10th Cir. 2014)

("[A]n ALJ's failure to weigh a medical opinion involves harmless error if there is no

inconsistency between the opinion and the ALJ's assessment of [RFC].").

Similarly, we see no reversible error in the weight the ALJ afforded to the

opinions of several state-agency, nonexamining consultants. Mr. Fulton claims the

ALJ erred in giving great weight to the February 2006 opinion of J. Isaacson, M.D.,

that his back impairments were non-severe because (1) Dr. Isaacson did not have the

benefit of Dr. Lewellen's later findings and (2) he did not specifically address the

examination findings of Frank Thomas, M.D., which, as the ALJ noted, showed some

tenderness and significant muscle spasms near Mr. Fulton's left sacroiliac joint. But

again, the ALJ found Mr. Fulton had severe spinal disorders, and his RFC took those

into consideration. We therefore see no reversible error with respect to Dr. Isaacson.

*See Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (explaining that an

ALJ's error is harmless "where, based on material the ALJ did at least consider (just

not properly), we [can] confidently say that no reasonable administrative factfinder,

---

[11] Mr. Fulton also argues that the ALJ should have considered Dr. Lewellen's findings as part of his determination that he was not fully credible. We will address that in later our decision.

following the correct analysis, could have resolved the factual matter in any other way").

Likewise, the ALJ did not commit reversible error when he afforded great weight to the opinions of Lawrence Kuo, M.D., and Evette Budrich, M.D., that there was insufficient evidence to rate the DIB portion of Mr. Fulton's claim.[12] Mr. Fulton bases his argument on an assumption that neither Dr. Kuo nor Dr. Budrich considered the findings of Drs. Lewellen and Thomas. To be sure, Drs. Kuo and Budrich provided very brief, conclusory statements regarding the state of the medical evidence and did not discuss any of that evidence. But we see nothing that bears out Mr. Fulton's assumption that they did not consider the examination findings of Drs. Lewellen and Thomas.

Mr. Fulton's real point appears to be that Drs. Kuo and Budrich were wrong because the findings of Drs. Lewellen and Thomas support that he was disabled prior to the expiration of his insured status, and therefore the ALJ should not have afforded their opinions great weight but instead should have found Mr. Fulton disabled based on the Lewellen/Thomas findings. However, we have rejected the notion that the ALJ failed to account for Dr. Lewellen's examination findings. And we see nothing so telling in Dr. Thomas's findings as to suggest that Drs. Kuo and Budrich erred in concluding that there was insufficient medical evidence to rate the disability portion

---

[12] Notably, through step four of the sequential evaluation process, Mr. Fulton had the burden to produce evidence that he was disabled. *See Musgrave v. Sullivan*, 966 F.2d 1371, 1376 (10th Cir. 1992).

16

of Mr. Fulton's claim, or that those findings should have led the ALJ to award benefits. In addition to finding that Mr. Fulton had low-back tenderness and spasms, Dr. Thomas observed that his straight-leg raising test was negative and that he had full range of motion, except for the lumbar spine. Dr. Thomas noted that Mr. Fulton had never had any x-rays or other testing, had never tried physical therapy, and complained that his back pain made it difficult to do manual labor, which of course the ALJ ruled out by limiting Mr. Fulton to sedentary work. Given the limited and relatively benign nature of Dr. Thomas's findings, and taking into consideration that the ALJ in fact rated the DIB portion of Mr. Fulton's claim, we cannot agree that the ALJ committed reversible error in affording great weight to the opinions of Drs. Kuo and Budrich.

## III.    Reliance on testimony of vocational expert

Mr. Fulton next contends the ALJ erred in relying on the testimony of a vocational expert (VE) that, with his RFC for only simple work, Mr. Fulton could work as a surveillance system monitor. He points out that the Dictionary of Occupational Titles (DOT) ascribes a reasoning level of "3" to that job, and in *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005), we viewed that reasoning level as inconsistent with an RFC that limited a claimant to simple work. Here, the ALJ failed to inquire of the VE as to any possible conflict between the DOT and the VE's testimony, or otherwise resolve the conflict, as required by Social Security Ruling 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000). The Commissioner concedes

17

this error but argues that the other job the ALJ relied on—final assembler—satisfies the Commissioner's step-five burden. We agree with the Commissioner.

The VE testified that there were 900 to 1,000 final assembler jobs in the Oklahoma region and 100,000 such jobs nationally. The relevant test is whether there is a significant number of jobs in *either* the regional *or* national economy. *Raymond v. Astrue*, 621 F.3d 1269, 1275 n.2 (10th Cir. 2009). Mr. Fulton does not contest the legal significance of 100,000 final assembler jobs in the national economy, but he contends the ALJ was wrong to rely on those jobs because the dispositive hypothetical the ALJ posed to the VE did not include all of his mental impairments, namely, his alleged moderate limitation in concentration, persistence, and pace; the moderate limitations Dr. Kendall noted in his ability to work in coordination with or proximity to others without being distracted and to respond appropriately to changes in the work setting; Dr. Lynch's diagnosis of avoidant personality disorder; and Dr. Repanshek's observation that Mr. Fulton becomes agitated or angry when he feels he is being watched or scrutinized. Because we have already concluded that the ALJ was not required to include any of those limitations in his RFC finding (or, in the case of Dr. Kendall, that the ALJ's RFC finding accounted for the limitations she found in Mr. Fulton's ability to work with others and respond to changes), the ALJ's hypothetical to the VE was not flawed. *See Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995) (explaining that a hypothetical question should contain "only . . . those impairments borne out by the evidentiary record").

18

## IV.    Credibility

The ALJ found that Mr. Fulton's credibility was "diminished for several reasons." Aplt. App. Vol. III, Admin. R. at 413. Mr. Fulton testified that he could not read or write well, but the ALJ found several instances in the record where he "had completed forms and responded to questions," indicating "significant reading and writing ability." *Id.* Mr. Fulton testified that his back and neck pain prevented him from working, but the ALJ pointed to his testimony that "until recently he spent many hours in bars playing pool." *Id.* And as for Mr. Fulton's testimony that he has a poor memory, the ALJ observed that he had "completed several reports saying that he needs no reminders for personal needs and grooming or taking medicine," and that the Red Rock reports showed an ability to focus and normal mental-status examinations except for anxiety. *Id.*

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990). "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted). It is the relationship of credibility to RFC that drives our analysis. *See Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009) ("Since the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC, the ALJ's credibility and RFC determinations are inherently intertwined.").

In challenging the credibility finding on his reading and writing ability, Mr. Fulton points to other parts of the record showing he had help completing forms. But that does not convert the ALJ's reliance on evidence that Mr. Fulton could read and complete rather lengthy forms himself into the sort of improper "picking and choosing" we have criticized. *See, e.g.*, *Keyes-Zachary*, 695 F.3d at 1166; *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004). His ability to read and write is not like an impairment whose severity might wax and wane or occasionally evade detection, thereby permitting an ALJ to selectively (and improperly) rely only on those medical reports showing the absence of disabling symptoms. And in any event, the ALJ limited Mr. Fulton to jobs that did not require reading above the sixth-grade level or writing above the third-grade level, an assessment Mr. Fulton has not taken issue with.

Much the same can be said for Mr. Fulton's challenge to the ALJ's credibility finding regarding his claim to have a poor memory. As Mr. Fulton points out, there is evidence that his wife prepared a daily planner for his medication and that he told Dr. Hartley he needed medication reminders. But he does not question the ALJ's observation that, in a number of forms, he said he did not need reminders. And his reliance on the statements in his Red Rock admission and discharge documents (discussed above) is unpersuasive, since we have already dispatched with the materiality of those records. Moreover, Mr. Fulton's testimony that he has a poor memory lacked detail, so even if believed, it says little about how poor his memory

20

is.[13] Consistent with the simple work the ALJ limited Mr. Fulton to, Drs. Kendall and Hartley considered Mr. Fulton not significantly limited in his ability to remember very short and simple instructions, and Dr. Hartley expressly opined that he had "adequate cognitive functioning to perform at least simple work related task[s]," Aplt. App. Vol. IV, Admin. R. at 634.

Finally, we see no error in the ALJ's reliance on Mr. Fulton's pool playing to diminish the credibility of his claim that back and neck pain prevent him from working. Mr. Fulton testified that over a four-month period ending a little more than a year before the ALJ hearing, he had gone to bars to drink and play pool three times a month, spending ten hours on one occasion. He now characterizes these outings as the sort of irregular, "sporadic diversions" not involving "prolonged physical activity" that we have said are not the sort of activities that show a claimant is capable of "substantial gainful activity." *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984). But in *Byron*, the "diversions" at issue were some jogging and occasional work for an hour as a janitor, there was favorable medical evidence regarding pain, and the Appeals Council found that the claimant was able to perform light work. *See id.* at 1235-36. Here, Mr. Fulton's billiards activities (particularly

---

[13] Mr. Fulton's only testimony regarding his memory came when the ALJ asked whether he could remember what month in 2003 he last worked. Mr. Fulton said he could not remember and that he "can't remember very well." Aplt. App. Vol. V, Admin. R. at 970. When the ALJ asked him if his memory was so bad that "most of what you're telling me isn't going to be reliable," Mr. Fulton responded that he was "not saying that at all, I'm just . . . not good with dates." *Id.*

21

his ten-hour stint[14]) were longer in duration, Mr. Fulton has not shown that the medical evidence (which the ALJ discussed at length) is consistent with his claim of disabling pain, and the question is whether he can perform sedentary work with numerous postural accommodations, not light work. The ALJ was justified in concluding that Mr. Fulton's pool playing was inconsistent with an inability to perform such work.

As noted in footnote 11, *supra*, Mr. Fulton argues that, when evaluating the credibility of his complaints of disabling back pain, the ALJ should have considered Dr. Lewellen's examination findings (low-back tenderness, radiating pain to the hips with straight leg raising, and a gait favoring his right side). Those findings, however, have little bearing on credibility because Dr. Lewellen did not assess any degree of functional limitation (or even indicate the severity of the symptoms she observed) that might support the credibility of Mr. Fulton's subjective complaints.

## CONCLUSION

The district court's judgment is affirmed.

Entered for the Court

John C. Porfilio
Circuit Judge

---

[14] Mr. Fulton faults the ALJ for not inquiring how many of the ten hours were spent actually playing pool, but at the hearing, Mr. Fulton responded affirmatively when the ALJ asked if he had "spent 10 hours in a bar playing pool." Aplt. App. Vol. V, Admin. R. at 993.