**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 18, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

REBECCA BRIDGES, on behalf of
R.M.B., a minor,

     Plaintiff - Appellant,

v.

COMMISSIONER, SSA,

     Defendant - Appellee.

No. 19-7031
(D.C. No. 6:18-CV-00016-KEW)
(E.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **BALDOCK**, and **KELLY**, Circuit Judges.
_____

Rebecca Bridges, on behalf of her minor daughter, R.M.B, appeals the district

court's decision that affirmed the Commissioner's denial of supplemental security

income benefits. Exercising jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C.

§ 405(g), we affirm.

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

## I. BACKGROUND

R.M.B. was four years old when her application for benefits was filed in July 2014. Bridges claimed her daughter was disabled due to Ehlers Danlos Syndrome (EDS), Attention Deficit Hyperactivity Disorder (ADHD), and absence seizures, which Bridges described as "silent type" or "zone out type" seizures. Aplt. App., Vol. 2 at 54.

Following the administrative denials of R.M.B.'s claim, Bridges requested a hearing before an administrative law judge (ALJ). The ALJ determined that R.M.B. was not disabled, and the Appeals Council denied review. The district court affirmed on appeal.[1]

### A. Pre-Hearing Medical Evidence and School Records

EDS is a genetic disorder caused by a defect in the body's connective tissues, which is manifested by unstable and hypermobile joints (double-jointedness), loose, stretchy skin, and fragile tissues that can, but do not always, affect multiple body systems. Not long after Bridges herself was provisionally diagnosed with EDS in late 2013, she questioned whether R.M.B. had the same condition. To that end, Bridges sought a medical evaluation, and in January 2014, R.M.B. was diagnosed with an unspecified type of EDS.[2]

---

[1] The parties consented to the jurisdiction of a magistrate judge.

[2] The physician noted that "Given how mild [R.M.B.'s] symptoms are, and the lack of a confirmed diagnosis in her mother, I do not see findings that would indicate that she is at risk for serious medical complications. I can understand why her mother is very concerned about her daughter, but unless the mother has a confirmed

2

An orthopedic consultation in April 2014 determined that R.M.B. had a full range of motion in all extremities, with no tenderness. Her joint hypermobility was symmetrical bilaterally, with no deformity and no instability. R.M.B. did have poor core strength, but her fine motor coordination, deep tendon reflexes, sensation, and neurological motor functions were all within normal limits. Although the provider agreed to provide R.M.B. with an elastic corset for stability, he said no formal follow-up was needed. At or about the same time, Bridges took R.M.B. for a special education evaluation at the pre-kindergarten level. R.M.B. did not qualify for services because she exhibited physical abilities comparable to those of her peers, needed no assistive devices for mobility or adaptive equipment for recess, and was deemed capable of managing self-care without modifications.

State-agency pediatrician Monica Fisher, M.D., reviewed R.M.B.'s records in October 2014, and opined that she had "less than marked" limitation in two domains—moving about and manipulating objects and health and physical well-being—and no limitations in the other four domains. As explained in more detail *infra*, there are six domains of functioning used to determine whether a child is disabled.

---

diagnosis of a genetic disorder that would put [R.M.B.] at risk, I do not think those concerns warrant further genetic tests on [R.M.B.] based on [my] clinical findings (and without a demonstrated genetic risk)." Aplt. App., Vol. 3 at 398. Bridges sought further testing, and in 2016, R.M.B. was diagnosed by Clair Francomano, M.D., with the hypermobility type of EDS, which mainly involves loose joints and chronic joint pain.

In November 2014, a nurse practitioner referred R.M.B. for occupational and physical therapy for joint hypermobility and delayed development of her gross and fine motor skills. And in December 2014, Bridges sought an evaluation for suspected ADHD. The examining physician, Mohsin Maqbool, M.D., assessed R.M.B. with ADHD; however, Dr. Maqbool recommended that Bridges take R.M.B. for a more comprehensive neuropsychological evaluation because "[q]uotient testing (computer based ADHD testing) is not standardized for children younger than 6 years." *Id*., Vol. 4 at 596. R.M.B. underwent a brain MRI in December 2014, which was found to be "[g]rossly normal." *Id*. at 592.

In February 2015, a second state-agency pediatrician, Patricia Nicol, M.D., and a state-agency psychologist, Susan Posey, Psy.D., reviewed R.M.B.'s records and concluded that she had "less than marked" limitations in two domains—health and physical well-being and acquiring and using information—and no limitations in the other four domains.

Because Dr. Maqbool could not perform computer-based ADHD testing, Bridges sought a further neuropsychological evaluation from Shannon E. Taylor, Ph.D., a pediatric neuropsychologist. Dr. Taylor tested R.M.B. on four occasions in March and April 2015 and concluded that R.M.B. "did not meet the [diagnostic] criteria for AD/HD," *id*., Vol. 5 at 637; nonetheless, Dr. Taylor recommended that "this is an area that should be closely and continuously monitored," *id*., and also offered some suggestion that might be helpful in a classroom setting.

4

A cardiology examination in June 2015 revealed no evidence of heart involvement: "[R.M.B.] has a normal, healthy heart. Her cardiac exam, E[K]G and echocardiogram were all entirely normal today. I reassured the family in this regard." *Id*. at 640. And at an orthopedic examination in July, R.M.B. was reported as "very energetic, running and jumping around the room without any apparent inhibitions." *Id*. at 641-42. The provider "reassured mom that [R.M.B.'s] exam is really quite normal. . . . We would be happy to give them a new corset . . . although we really frankly do not think it is necessary." *Id*. at 642.

When R.M.B. started kindergarten in the fall of 2015, she was in a regular classroom; nonetheless, she was placed on a Section 504 plan, which is designed to meet a child's educational needs even if they are not provided with special education services.[3] On November 20, the school district reported that R.M.B. "has been absent a total of 28 days out of 59 days as of [November 16]" and that a form for a physician to authorize homebound services, which was given to R.M.B.'s parents on November 6, has not been returned as of November 19. *Id*., Vol. 3 at 298.

The school district's November 20 report also refers to a form from Dr. Maqbool, dated September 23, 2015, "which indicated that [R.M.B.] is currently diagnosed with [EDS] and ADHD." *Id*. at 301.[4] According to Dr. Maqbool, EDS

---

[3] *See* SSR 09-2p, 2009 WL 396032, at *10.

[4] R.M.B. *had not* been diagnosed with ADHD by September 2015; rather, Dr. Taylor said in April that R.M.B. did not meet the diagnostic criteria for ADHD.

"make[s] it difficult for [R.M.B.] to transfer on and off the bus independently, [and] she has difficulty with mobility and seating within the general education classroom, as well as difficulty performing activities found in the general education classroom (i.e. cutting, writing) and she may require special adaptations to the general program." *Id*. at 302. Dr. Maqbool also reported that R.M.B. "has difficulty maintaining alertness in the general classroom and needs additional rest periods." *Id*. Despite the lack of a diagnosis of ADHD, Bridges "requested that this additional eligibility of ADHD . . . be reflected in [R.M.B.'s] eligibility for special education services." *Id*.

Further, the school district's report notes that on October 16—three days after R.M.B. turned six years old—Bridges circled back to Dr. Maqbool for computer-based ADHD testing. Dr. Maqbool tested R.M.B. and diagnosed her with ADHD. According to Dr. Maqbool, R.M.B. has "attention deficits, memory difficulties, learning difficulties, language problems, handwrit[]ing difficulties, [impaired] fine [and] gross motor skills, poor social skills, disturbed sleep, unsteady gait, muscle weakness." *Id*., Vol. 5 at 717. He assessed her with "extreme" limitations in the domains of acquiring and using information, caring for herself, and health and physical well-being, and "marked" limitations in the domains of attending and completing tasks, interacting and relating with others, and moving about and manipulating objects.

Also reflected in the school district's report is that sometime in late September 2015, R.M.B. "began taking medication for ADHD related symptoms," and by

6

November 11, there was "a significant difference in [R.M.B.'s] ability to sit and maintain adequate attention to task[s] since beginning the medication." *Id*., Vol. 3 at 305. In fact, by the time of the November 20 report, school personnel observed "marked improvement in [her] behavioral and attention functioning," and noted "her current behaviors do not appear to warrant specially designed instruction . . . related to . . . ADHD." *Id*. at 316.

In December 2015, Bridges told school officials that a "physician is recommending that on days when [R.M.B.] is extremely fatigued or tired[] [that] she come to school in her wheelchair." *Id*., Vol. 6 at 844. Bridges then proceeded to lay out her instructions for R.M.B.'s care at school, including how to operate her wheelchair and directed that R.M.B. should use the bathroom only when accompanied by "a nurse-trained staff member who is supervising [her] stability and safety." *Id*. The school responded that it would honor Bridges's requests.

In early 2016, Bridges refocused on R.M.B.'s physical problems, and reported that she had chronic pain, partial joint dislocations, abdominal pain, asthma and recurrent bronchitis. Medical examinations from this time period show that R.M.B.'s immune system and lungs tested normal and no abdominal problems were detected; however, she demonstrated some instability during walking.

## B. Administrative Hearing

Three witnesses—Bridges and two medical experts—testified at the May 2016 administrative hearing.

Bridges testified that R.M.B. was "home bound per the school," because it could not "accommodate the different needs that she has." *Id.*, Vol. 2 at 52. According to Bridges, "unanswered questions about [R.M.B.'s] safety . . . pushed [the school] . . . past the point of feeling comfortable that she would be at the school[] [so] they provide full-time tutoring to her in the home." *Id.* at 55. She also told the ALJ that R.M.B. "had very little to no socialization unfortunately due to low functioning immune system" and they were reluctant to "take her out of the home." *Id.* at 56. Bridges further testified that R.M.B: (1) required braces on her feet and a corset; (2) constantly falls down; (3) has "a very, very high rate of ADHD," *id.* at 59; (4) could only hold a pencil after undergoing six months of physical therapy; and (5) has joint dislocations twenty times a day.

Subrmaniam Krishnamuathi, M.D., testified that R.M.B. had a "mild" limitation in one domain—health and physical well-being—and no limitations in the other five areas. Psychologist Beth Ann Maxwell, Ph.D., testified that R.M.B. had "less than marked" limitations in three domains—acquiring and using information, attending and completing tasks, and moving about and manipulating objects—and no limitations in the other domains.

## C. Post-Hearing Examination

Following the hearing, R.M.B. underwent a consultative examination by Joseph Ray, M.D. Dr. Ray observed that R.M.B. "was alert and had age appropriate speech. Mood was appropriate and had clear thought processes. [R.M.B] was oriented to time, place, person, and situation for [her] age level." *Id.*, Vol. 6 at 853.

8

She also "had a steady, symmetric gait and was able to walk without an assistive device." *Id.* Other than noting hyperextension of R.M.B.'s elbows, fifth digits, and legs, along with mildly elastic and translucent skin, Dr. Ray's examination findings were normal; nonetheless, using a form that addresses functions relevant to adult work activity—such as how much weight a claimant can lift, and how long the claimant can stand or sit without a break—Dr. Ray found that R.M.B. had some physical limitations in these areas.

## D. ALJ's Decision

The ALJ found that R.M.B. had the severe impairments of EDS, ADHD and seizures. Because none of R.M.B.'s impairments *medically* equaled a Listing, the ALJ considered the six domains of functioning to determine whether R.M.B.'s impairments *functionally* equaled a Listing. The ALJ found that R.M.B. had "less than marked" limitations in four of the six domains, and no limitations in the other two domains, and was not disabled.[5]

## II. STANDARD OF REVIEW

"We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (internal quotation marks omitted).

---

[5] A finding of disability requires the ALJ to find the child has "marked" limitations in at least two domains or "extreme" limitations in at least one domain. *See* 20 C.F.R. § 416.926a(d).

> Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance. We consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but we will not reweigh the evidence or substitute our judgment for the Commissioner's.

*Id.* (citations and internal quotation marks omitted).

Moreover, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Id.* (internal quotation marks omitted). "We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Id.* (brackets and internal quotation marks omitted).

Last, "[w]here . . . we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal. In conducting our review, we . . . must[] exercise common sense. . . . [W]e cannot insist on technical perfection." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012).

### III. LEGAL FRAMEWORK

To meet the burden of proving disability, an individual under the age of 18 must show that she has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(i). "Marked and severe functional limitations, when used as a

10

phrase . . . [i]s a level of severity that meets, medically equals, or functionally equals the [L]istings." 20 C.F.R. § 416.902(h).

To determine whether impairments functionally equal a Listing, the ALJ considers how the child's impairments affect functioning is six domains: (1) "[a]cquiring and using information"; (2) "[a]ttending and completing tasks"; (3) "[i]nteracting and relating with others"; (4) "[m]oving about and manipulating objects"; (5) "[c]aring for yourself"; and (6) "[h]ealth and physical well-being." 20 C.F.R. § 416.926a(b)(1).[6]

If the child's impairments result in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairments will be considered functionally equivalent to a Listing, and the child will be found disabled. *See id*. § 416.926a(d). A "marked" limitation is one in which the impairments "interfere[] seriously with [the] ability to independently initiate, sustain, or complete activities." *Id*. § 416.926a(e)(2)(i) (internal quotation marks omitted). An "extreme" limitation is one in which the impairments "interfere[] very seriously with your ability to independently initiate, sustain, or complete activities" *Id*. § 416.926a(e)(3)(i) (internal quotation marks omitted). In deciding whether a child's limitations are "marked" or "extreme," the ALJ "compare[s] your functioning to the typical

---

[6] What each domain means is set forth in 20 C.F.R. § 416.926a(g)-(l). For example, the ability to acquire and use information means how well a child acquires or learns information and how well she uses the information she has learned. *See id*. § 416.926a(g).

11

functioning of children your age who do not have impairments." *Id*. § 416.926a(f) (internal quotation marks omitted).

## IV. ANALYSIS

Bridges argues that the ALJ made three errors that either entitle her to an immediate award of benefits or a remand for further proceedings.

### A.  Consistency

Bridges maintains that the ALJ's "vague[]" analysis and failure to *specifically* "say which [of her] statements are allegedly inconsistent" with the other evidence, places the ALJ's decision beyond meaningful review.  Aplt. Opening Br. at 32.  We disagree.

In a thorough and comprehensive decision, the ALJ discussed Bridges's testimony and reports of R.M.B.'s symptoms, and found her accounts were not supported by R.M.B.'s "school records and evaluations," or "medical treatment notes."  Aplt. App., Vol. 2 at 34.

To be sure, we will not guess at what evidence might support an ALJ's decision.  *See Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1176 (10th Cir. 2014) (noting an ALJ's decision that "le[aves] [this court] to guess what evidence, if any, belies [the] testimony," is inadequate).  But there is no guesswork here; instead, we can easily ascertain the inconsistencies between Bridges's accounts and the other evidence when we read the ALJ's decision.

12

**B. Evaluating/Weighing Medical Opinions**

An ALJ evaluates opinion evidence under the rules set forth in 20 C.F.R. § 416.927. "Generally, [the ALJ] give[s] more weight to the medical opinion of a source who has examined [the claimant] than to the medical opinion of a medical source who has not examined [the claimant]." *Id.* § 416.927(c)(1). In addition to considering the treatment relationship, specialization, and other factors, the ALJ looks at supportability and consistency. Specifically, "[t]he more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight [the ALJ] will give that medical opinion. The more explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion." *Id.* § 416.927(c)(3). And "[t]he more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." *Id.* § 416.927(c)(4).

**i. *Dr. Maqbool***

Based on his own diagnosis of ADHD, Dr. Taylor's neuropsychological examination, and the results of an MRI and EKG, Dr. Maqbool opined, without any explanation, that R.M.B. had three "extreme" and three "marked" limitations in the six domains of functioning. The ALJ gave Dr. Maqbool's opinion "less weight" because it is "not fully supported by [R.M.B.'s] school records, and [it is] inconsistent with the medical expert testimony." Aplt. App., Vol. 2 at 34. We disagree that the ALJ erred when he assigned less weight to Dr. Maqbool's opinion.

13

First, Dr. Maqbool's opinion is not supported by his *only* treatment note in the record, when, in December 2014, he assessed R.M.B. with symptoms of ADHD, but otherwise found no joint pain, gait abnormalities, or strength deficits. Although Dr. Maqbool re-tested R.M.B. in October 2015, and diagnosed her with ADHD, none of his testing is part of the record.[7]

Second, Dr. Maqbool relied on a neuropsychological examination and MRI and EKG for his opinion. But Dr. Taylor found that R.M.B. did not meet the diagnostic criteria for ADHD, and R.M.B.'s MRI and EKG were normal.

Third, Dr. Maqbool's opinion is inconsistent with the record taken as a whole. In this regard, Bridges complains that the ALJ "certainly failed to note [that Dr. Maqbool's opinion is] supported by, and [is] supportive of, findings and opinions from [Dr. Ray], the Commissioner's own consultative examiner." Aplt. Opening Br. at 22. But Dr. Ray's and Dr. Maqbool's reports do not support each other. Although Dr. Ray opined that R.M.B. had some physical limitations, such as how much weight she could lift or how long she could stand or sit without a break, he never expressed or suggested, *in any way*, that R.M.B. had limitations in her ability to acquire and use information, attend to and complete tasks, or interact and relate to others.

---

[7] In October 2015, Dr. Maqbool wrote a letter addressed to whom it may concern that said nothing more than that R.M.B. was being followed for ADHD, among other diagnoses.

## ii.  *Dr. Ray*

Dr. Ray examined R.M.B. following the administrative hearing.  Other than noting hyperextension of R.M.B.'s elbows, fifth digits, and legs, along with mildly elastic and translucent skin, Dr. Ray's examination findings were normal; nonetheless, Dr. Ray found R.M.B. had physical limitations that "affect[] her ability to function secondary to difficulty standing, walking, lifting and bending."  Aplt. App., Vol. 6 at 851.  The ALJ said that he "considered" Dr. Ray's opinions and that they were "incorporated into the findings that [R.M.B.] had less than marked limitation in health and physical well-being [and] moving [about] and manipulating objects."  *Id.*, Vol. 2 at 34.

Bridges maintains that the ALJ was not telling the truth when he said he considered Dr. Ray's opinions and incorporated them into his findings because "if this were true, R.M.B. would have been found disabled."  Aplt. Opening Br. at 23. We disagree.  "Where, as here, the ALJ indicates he has considered all the evidence our practice is to take the ALJ at his word."  *Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009) (brackets and internal quotation marks omitted).  More to the point, nothing in Dr. Ray's evaluation *requires* a finding that R.M.B. is disabled.  And in any event, Dr. Ray's opinion "is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]." *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994); *see also* 20 C.F.R. § 416.927(d)(1).

15

### iii.  *Other Medical Evidence*

According to Bridges, the ALJ failed to *adequately* discuss evidence from: (1) Nurse Jacob, who, in November 2014, referred R.M.B. for occupational and physical therapy to build core strength, develop gross and fine motor skills, provide protection for her joints, and increase her ability to perform activities of daily living; (2) Dr. Taylor, who, in April 2015, found that R.M.B. did not meet the diagnostic criteria for ADHD, but offered some suggestions that might be helpful to R.M.B. in a school setting; and (3) Dr. Francomano, who, in February 2016, diagnosed R.M.B. with the hypermobility type of EDS, and recommended some specialists Bridges could see to determine whether R.M.B. had a tethered cord and help with pain management.

It is well-established that "[t]he ALJ is not required to discuss every piece of evidence." *Wall*, 561 F.3d at 1067 (internal quotation marks omitted).  "[W]e will generally find the ALJ's decision adequate if it discusses the uncontroverted evidence the ALJ chooses not to rely upon and any significantly probative evidence the ALJ decides to reject." *Id.* (internal quotation marks omitted).  Here, the ALJ did not ignore the evidence that R.M.B.:  (1) received physical therapy; (2) was diagnosed with the hypermobility type of EDS; and (3) needed some adjustments at school.  Nor did he reject any significantly probative evidence because none of the three medical providers offered opinions on R.M.B.'s functional limitations.  No further discussion or analysis was necessary.

## C.  Six Domains of Functioning

Finally, Bridges argues that the ALJ's decision is not supported by substantial evidence because there was other evidence in the record from which the ALJ could have found R.M.B. disabled.  This argument also lacks merit.

Our review is confined to whether the ALJ's factual findings are supported by substantial evidence and whether the correct legal standards were applied.  *See Lax*, 489 F.3d at 1084.  We have already determined that the ALJ applied the correct legal standards, which leaves only the question of substantial evidence.  Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support a conclusion.  *See id.* at 1084.  Once we determine the factual findings are supported by substantial evidence and the correct legal standards were applied, our inquiry is complete.  *See id*. ("We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."  (brackets and internal quotation marks omitted)).

Recall that every medical expert other than Dr. Maqbool—Drs. Krishnamuathi, Maxwell, Fisher, Nicol, and Posey—all opined that R.M.B. did not have "extreme" or "marked" limitations in any of the six domains.  These opinions are evidence that a reasonable mind would accept as adequate to support the ALJ's conclusion that R.M.B. was not disabled.

## V.  CONCLUSION

We affirm the district court's order upholding the Commissioner's denial of benefits.

Entered for the Court


Bobby R. Baldock
Circuit Judge